People of the State of Illinois, ex rel. Laura Gonzalez, Plaintiff-Appellee, v. Walter G. Monroe, Defendant-Appellant.

### Gen. No. 11,724.

Second District, Second Division.

September 12, 1963.

Rehearing denied October 10, 1963.

Bruce E. Kaufman, of Waukegan, for appellant.

Bruno W. Stanczak, of Waukegan (Paul W. Kaiser, Jr., of counsel), for appellee.

WRIGHT, J.

A paternity action was commenced in the County Court of Lake County upon the complaint of the plaintiff, Laura Gonzalez, against the defendant, Walter G. Monroe. At the time of the conception of the child, the plaintiff was a married woman living in the same household with her husband. A preliminary hearing was had before the County Judge who found that there was sufficient cause to hold the case for trial.

A trial by jury resulted in a verdict finding that the plaintiff, on the 10th day of March, 1960, was delivered of a male child out of wedlock, born alive and now living and further found that the defendant was the father of said child and that the plaintiff and defendant were not husband and wife.

Defendant's post-trial motion was overruled and judgment entered on the verdict. From this judgment, defendant appeals.

The defendant contends that the child here involved was conceived at the time plaintiff was married to Frank Gonzalez and that there is a presumption that the child is legitimate which has not been rebutted by sufficient evidence.

The plaintiff was married in 1934 to Frank Gonzalez and five children were born of that marriage. She was divorced from him on January 19, 1960, and continued to live in the same household after the divorce. The child in question was allegedly conceived during the first week of June, 1959, and was born on the 10th day of March, 1960. The plaintiff and defendant first met at a hospital in 1957 where she was employed as a nurse and he was a patient. She testified that they met at different places during 1957 and he professed to love her and vice versa. She stated that about the first of June, 1959, she and the defendant went on a one-week vacation leaving on a Sunday and returning on a Sunday; that they stayed in various motels and went to the Wisconsin Dells and to Lake Geneva where they stayed at a rooming house. On this trip, the defendant is alleged to have purchased a wedding band for her. She stated that on this trip and at various and numerous other times they engaged in sexual intercourse and discussed divorcing their respective spouses.

During 1959, plaintiff advised the defendant that she thought she was pregnant. The plaintiff was hospitalized in August of 1959 for high blood pressure and defendant visited her in the hospital every day and after her release from the hospital the defendant told his wife about the situation. Plaintiff went to the residence of the defendant and had a conversation with Mr. and Mrs. Monroe. A few days later, she again returned and had a conversation at which time, Reverend Charles McElvancy who was then pastor of the First Methodist Church was present. Shortly after

3

the series of meetings between Mrs. Gonzales and Mr. and Mrs. Monroe, Mrs. Gonzalez and Mr. Monroe went to the home of Dr. Robert Robbins, a physician in the City of Waukegan, and the personal physician of the Monroe family.

Dr. Robert H. Robbins, M.D., testified that the defendant called him at his home stating that it was important that he talk to him. The plaintiff and the defendant talked with Dr. Robbins at his home about the possibility of terminating her pregnancy. In other words, the question of abortion was discussed, at which time he said he was not going to do it and he didn't know of anybody who would.

Patricia Miller, a lady friend of the plaintiff's, testified that on or about June 1, 1959, she drove the plaintiff to the Northwestern Railroad Station to meet the defendant where the plaintiff unloaded her suitcases into the automobile of the defendant's. She further testified that she met the plaintiff and defendant together approximately seven days later at which time they transferred the luggage from the defendant's automobile into the automobile driven by Mrs. Miller. Mrs. Miller testified that during this seven-day period, while plaintiff was gone, she kept the plaintiff's young daughter. Mrs. Miller also testified to participating in conversations with the plaintiff and defendant about the defendant obtaining a divorce and telling his wife about the situation because of the baby.

Frank Metz, age 23, and Marina Metz, age 21, children of the plaintiff, both testified that their father was Spanish and that the two of them and the other three children of the plaintiff's are all dark complected with dark eyes and dark hair and that the child in question has a very fair complection, blue eyes and light blond hair.

The witness, Frank Metz, further testified that he had seen his mother with the defendant on numerous

4

occasions; that the defendant had admitted to him that he had gone to different motels with the plaintiff and had told his wife that he was going on a trip. Marina Metz testified that she had taken drives in an automobile on different occasions with her mother and the defendant and on some of these occasions, the defendant asked her if she would live with her mother and him after they got married.

The plaintiff testified that she and her husband had not slept in the same bed or bedroom since 1955 and did not speak to each other. This was verified by the testimony of Frank Metz. The testimony of the plaintiff concerning sexual intercourse or the lack thereof with her husband is conflicting. On direct examination, she testified, "I had intercourse with my husband once after I met Walt. To the best of my knowledge it was in 1957. I am positive this was the last time." On cross examination, she testified, "While I lived in the house with Gonzalez from 1957 until 1960, I only had intercourse with him one time."

The defendant denied categorically that he had, at any time, had sexual intercourse with the plaintiff. He denied that he was ever in Wisconsin with the plaintiff and denied that he had ever contemplated divorce of his wife and marriage to the plaintiff. He admitted that he accompanied the plaintiff to the home of Dr. Robbins for a discussion with him of the termination of her pregnancy. He also admitted that he had been alone with her for automobile drives on more than one occasion. He testified that he had left by himself about the first of June, 1959, for a fishing trip in Wisconsin but he did not know the names of any motels where he stayed; that he returned home on June 5, 1959, from his fishing trip and attended a party at Great Lakes, Illinois, accompanied by his wife. This was verified by his wife and another witness.

5

■ It is clear from the evidence adduced at the trial that the plaintiff and defendant had for a long period of time engaged in a clandestine affair and were so engaged at the time of the conception of the child here in question. However, this fact standing alone is not sufficient to overcome the presumption that a child born during wedlock is legitimate.

■ ■ There is a presumption that the husband is the father of a child born to his wife and at common law this presumption was practically a conclusive one. Such presumption was conceived for the purpose of preserviing family stability and protecting helpless infants from the stigma of illegitimacy. People v. Powers, 340 Ill App 201, 91 NE2d 637. This presumption is not absolutely conclusive, but it has great force and vigor and can only be overcome by clear and convincing proof. If it appears that there was no possibility of access by the husband to the wife at the time of the conception and that in the course of nature the husband could not have been the father of the child, the presumption cannot prevail. Robinson v. Ruprecht, 191 Ill 424, 61 NE 631. However, the presumption and charity of the law are in the child's favor and those who wish to bastardize him must make out the fact by clear and irrefragable proof. Orthwein v. Thomas, 127 Ill 554, 21 NE 430.

The uncontradicted evidence in the instant case discloses that the plaintiff and her husband, Frank Gonzalez, were married and living in the same house and were easy accessible to each other at the time the child in question was conceived, and this fact raises a strong presumption that the child born to the plaintiff on March 10, 1960, is legitimate, and the burden of overcoming this presumption of legitimacy is with the plaintiff and such presumption can only be overcome by strong, satisfactory and conclusive evidence that the child was not that of her lawful husband.

6

The only evidence presented by the plaintiff on this issue is her own self serving conflicting testimony that she and her husband had intercourse only once from 1955 to 1960. In Vettin v. Wallace, 39 Ill App 390, at 397, in holding that a mother will not be permitted to bastardize her own offspring, the court said: "For reasons of public decency and morality, a married woman can not say she had no intercourse with her husband, and that her offspring is spurious."

The plaintiff was living in the same house with her husband at the time the child was conceived and was easily accessible to him. There is not one shred of evidence in the record except for the plaintiff's own testimony, to sustain her allegation that she had no intercourse with her husband during this time. Such evidence will not overcome the presumption of legitimacy which is one of the strongest presumptions in law. Plaintiff relies on People v. Gleason, 211 Ill App 380, for the proposition that the presumption of legitimacy is rebutted by proof of no intercourse by the husband during the time of conception. In that case, the court held that the legal presumption obtains that every child born in wedlock is legitimate, still it is a presumption which is rebuttable when the proof conclusively shows that the husband had no power of procreation or that the circumstances were such as to render it impossible that he could be the father of the child.

In the instant case, there is little or no evidence other than the plaintiff's own self serving statement that she did not have intercourse with her husband during the period of conception. There is no evidence in the record that her husband lacked the power of procreation or that the circumstances were such as to render it impossible that he could be the father of the child.

The evidence is conclusive that plaintiff and defendant were seeing each other and romancing during

7

all of the time that the child was conceived and there is evidence that plaintiff and defendant engaged in conversations, meetings and discussions with doctors about the expectant child, but when all of the evidence is considered in its light most favorable to the plaintiff, it is not sufficient to overcome one of the strongest presumptions in the law, namely that of legitimacy. The rule in this state is ably stated by the court in Orthwein v. Thomas, supra, in the following quotation:

> "The presumption and charity of the law are in his (the child's) favor, and those who wish to bastardize him must make out the fact by clear and irrefragible proof. The presumption of law is not lightly to be repelled. It is not to be lightly broken in upon, or shaken by a mere balance of probabilities. The evidence for repelling it must be strong, satisfactory and conclusive."

Clear and irrefragable proof was not presented by the plaintiff as to nonintercourse with her husband during the time the child was conceived. Her case was based primarily upon her own testimony of no intercourse and our courts have held that a wife will not be allowed to make such statement as long as she is living with her husband. At the time the child was conceived in the instant case, the plaintiff was living in the home with her husband which they had shared for some twenty-five years and was during the period of the conception of the child readily accessible to her husband. Under such circumstances, we conclude that the presumption of legitimacy was not overcome.

For the reasons herein stated, the judgment of the County Court of Lake County is reversed.

Judgment reversed.

CROW, PJ and SPIVEY, J, concur.