LESTER EDWIN HAPPEL, Plaintiff-Appellant, *v.* HARRIET M. MECKLENBURGER *et al.*, Defendants-Appellees.

First District (4th Division)    No. 80-1662

Opinion filed October 8, 1981.

ROMITI, P. J., dissenting.

J. Daniel Azulay, of Azulay & Azulay, of Chicago, for appellant.

Schiller & Du Canto, of Chicago (Donald C. Schiller and Pamela S. Trapp Goodemote, of counsel), for appellees.

Mr. JUSTICE JOHNSON delivered the opinion of the court:
This is an appeal from the grant of defendants' motion for a directed finding based on plaintiff having failed to prove a prima facie case and overcome the presumption of legitimacy of a child born to a marriage. Plaintiff raises the following issues for review: (1) whether the trial court's directed finding was contrary to the evidence; (2) whether the trial court erred in denying plaintiff's motion that defendant James submit to a blood test; (3) whether the trial court erred in denying plaintiff's motion for the parties to submit to the Human Leucocyte Antigen (HLA) test; and (4) whether the statutory scheme as represented by the Paternity Act (Ill. Rev. Stat. 1979, ch. 40, par. 1351 *et seq.*) denies to males the equal protection of the laws and interferes with plaintiff's fundamental right to exercise fatherhood.

We affirm.

Defendant Harriet Mecklenburger was called under section 60 and testified that in the summer of 1972 defendants advertised for a babysitter on the bulletin board of Northwestern University. The service of baby-sitting 3 days per week for the Mecklenburgers' 3-year-old adopted daughter would be exchanged for a rent-free room. Plaintiff responded to the advertisement and, a few weeks later in September 1972, moved into defendants' Evanston residence. A friendship and subsequent love affair developed between plaintiff and defendant Harriet.

Harriet further testified that she and her husband were having difficulty conceiving a child. Both were undergoing treatment at the Northwestern University Fertility Institute. Harriet had ovulatory problems and James was diagnosed as having a low sperm count. On December 12, 13, and 14, 1972, Harriet underwent treatment at the Institute. She stated that on December 13, 1972, she was artificially inseminated with sperm of her husband and an anonymous donor. On December 12, 1972, she had sexual intercourse with her husband. Plaintiff testified that on that same evening, while James was asleep, Harriet had sexual intercourse with him. On January 5, 1973, Harriet's pregnancy test was positive. She was delivered of a male child on August 31, 1973. Harriet's husband, James, was considered the father of the child.

The love affair between plaintiff and Harriet continued intermittently

during the pregnancy. However, in March 1973, plaintiff moved out to share an apartment with a woman he had begun to date. Plaintiff testified that Harriet would visit while the other woman was at work, or occasionally he would visit Harriet. After the birth of the child, Harriet took him on her visits to plaintiff.

Plaintiff and several witnesses testified that Harriet frequently made references to the events leading up to her pregnancy. According to the witnesses, Harriet stated that Jim, her husband, Ed (the plaintiff), or the donor could be the father. Plaintiff offered many love letters and cards he had received from Harriet which contained references to their relationship and references to the possibility that plaintiff might be the child's father. After the birth of the child, though plaintiff and Harriet continued their affair on an infrequent basis, the record reflects that each engaged in affairs with others. Plaintiff saw the child on visits and occasionally purchased gifts for him. But, it was established that the gifts, consisting of a gold birth ring, a rattle and a toy car, were no more significant than those that plaintiff gave to the children of friends.

In 1976, plaintiff traveled extensively in Europe, Africa and the Middle East, returning to the United States in 1977. Most of the letters and cards offered into evidence were written by Harriet to plaintiff during this period. Also, during the 1976-77 period, the Mecklenburgers separated. Their marriage was dissolved by a District of Columbia court in December 1977. James was adjudicated the father of the two children born or adopted during the marriage. He has provided for their support. When plaintiff returned to the United States in January 1977, he needed a place to live. Harriet allowed plaintiff to move in with her. Plaintiff cared for the male child 3 days per week while Harriet worked. Harriet's young daughter was attending school during the day. In April 1977, after a quarrel, Harriet asked plaintiff to leave her home.

On November 28, 1978, plaintiff filed his action seeking declaration that he is the father of the child, a grant of visitation rights, and an order preventing Harriet from removing the child from Cook County or secreting the child from plaintiff. A guardian ad litem was appointed for the child. The guardian attempted to restrain plaintiff from discussing the case with the press. In June 1979, the plaintiff, defendant Harriet, and the child underwent blood tests at Evanston Hospital. The results did not exclude plaintiff as the father of the child. In September 1979, plaintiff petitioned for additional blood tests, specifically the Human Leucocyte Antigen Test (HLA). This request was denied. After filing motions and memoranda of law, plaintiff obtained leave to join defendant James as a party defendant on November 29, 1979. Hearings began in March 1980.

Harriet was called under section 60. Plaintiff's exhibits consisting of love letters and cards sent by Harriet to plaintiff were offered into

evidence. Harriet denied that she ever said plaintiff was the father of her son. Plaintiff testified and on cross admitted that he had not supported or offered to support the child. Friends of the plaintiff testified as to conversations they had with Harriet during the years of the affair. Each stated that Harriet had said it was possible that plaintiff was the father, but no one testified that Harriet said plaintiff was the father. On cross, these friends were shown to have a particular bias about the litigation and the parties—each, at one time, had been a lover of one of the parties to this litigation.

At the close of plaintiff's case in chief, the defendants moved for a directed finding on the grounds that plaintiff had failed to overcome the presumption of legitimacy of a child born into a marriage. In granting the motion, the trial court stated that plaintiff had failed to show either the impossibility of James' access to Harriet, James' sterility, or James' total lack of power of procreation. Under the law of Illinois, James, not plaintiff, is deemed to be the child's father. Plaintiff appeals.

Plaintiff contends the trial court's directed finding in favor of defendants was contrary to the evidence. We do not agree. Our courts have held that in nonjury cases in ruling on a section 64(3) motion (Ill. Rev. Stat. 1979, ch. 110, par. 64(3)), the court must apply a two-step analysis. (*Chicago Title & Trust Co. v. Ceco Corp.* (1980), 92 Ill. App. 3d 58, 68, 415 N.E.2d 668, 676.) Firstly, the trial judge must determine, as a matter of law, whether the plaintiff has made out a prima facie case. (*Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154, 407 N.E.2d 43, 45.) The plaintiff must have presented some evidence, more than a scintilla, on every essential element of his cause of action. (*Chicago Title & Trust Co.*, at 68.) If he has not, the court should, without more, grant the motion and enter judgment in the defendant's favor. *Kokinis*, at 155.

■■ Secondly, if plaintiff has made out a prima facie case, the trial judge, in the role of finder of fact, must weigh the evidence. (*Kokinis*, at 155.) The court must consider all of the evidence, including any favorable to the defendant, and must pass on the credibility of witnesses, draw reasonable inferences from the testimony, and generally consider the weight and the quality of the evidence. *Kokinis*, at 154. Accord, *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 57, 349 N.E.2d 399, 408; *Jackson v. Navik* (1976), 37 Ill. App. 3d 88, 90, 346 N.E.2d 116, 120.

This weighing process may result in the negation of some of the evidence necessary to the plaintiff's prima facie case, in which event the court should grant the defendant's motion and enter judgment in his favor. (*Kokinis*, at 155.) If, however, after the weighing process, there is sufficient evidence to establish that plaintiff's prima facie case remains, the court should deny the defendant's motion and proceed as if the

motion had not been made. (*Kokinis*, at 155.) On appeal, the decision of the trial court should not be reversed unless it is contrary to the manifest weight of the evidence. *Kokinis*, at 154.

Plaintiff attempted to establish his paternity of a child born August 31, 1973 to the Mecklenburgers. To do this, plaintiff had the burden of proof of overcoming the presumption of legitimacy. The presumption is that a child born to a married woman is legitimate. *People ex rel. Adams v. Mitchell* (1980), 89 Ill. App. 3d 1023, 1028, 412 N.E.2d 678, 682; *In re Ozment* (1978), 61 Ill. App. 3d 1044, 1047, 378 N.E.2d 409, 412; *People ex rel. Smith v. Cobb* (1975), 33 Ill. App. 3d 68, 70, 337 N.E.2d 313, 315; *People ex rel. Jones v. Schmitt* (1968), 101 Ill. App. 2d 183, 186, 242 N.E.2d 275, 276; *People ex rel. Gonzalez v. Monroe* (1963), 43 Ill. App. 2d 1, 7, 192 N.E.2d 691, 693; *People v. Powers* (1950), 340 Ill. App. 201, 204, 91 N.E.2d 637, 638.

■■ The presumption, however, is not conclusive; it may be rebutted by clear and convincing evidence. (*People ex rel. Smith*, at 70.) The court in *Orthwein v. Thomas* (1889), 127 Ill. 554, 21 N.E. 430, described the quantum of evidence as clear and irrefragable. Our courts have held that this proof must conclusively show that the husband had no power of procreation or that the circumstances were such as to render it impossible that the husband could be the father of the child. *People ex rel. Hood v. Gleason* (1918), 211 Ill. App. 380, 383.

What the courts have found as clear and convincing evidence to overcome the presumption has been testimony that the mother did not know nor was she married to her husband at the time of conception. (*People ex rel. Hood v. Gleason.*) The mother and her husband had not lived together for many years prior to the birth of the child. *People ex rel. Smith v. Cobb* (1975), 33 Ill. App. 3d 68, 337 N.E.2d 313; *Robinson v. Ruprecht* (1901), 191 Ill. 424, 61 N.E. 631.

Where the wife and husband both testify that they did not cohabit, the courts have found this evidence sufficient to overcome the presumption. (*People ex rel. Jones v. Schmitt* (1968), 101 Ill. App. 2d 183, 242 N.E.2d 275; *In re Ozment* (1978), 61 Ill. App. 3d 1044, 378 N.E.2d 409.) Significantly, in *Jones* and *Ozment*, the putative father had assumed the responsibilities of fatherhood from the onset of pregnancy. Thus, acts by the putative father corroborated the evidence of the wife and husband. The courts require corroborating evidence of inaccessibility. (*In re Ozment.*) A husband, alone, may not challenge legitimacy (*People v. Powers* (1950), 340 Ill. App. 201, 91 N.E.2d 637; *People v. Askew* (1979), 74 Ill. App. 3d 743, 393 N.E.2d 1124), nor may a mother when she has continued to live and cohabit with her husband. *People ex rel. Gonzalez v. Monroe* (1963), 43 Ill. App. 2d 1, 192 N.E.2d 691.

Plaintiff testified that he had intercourse with defendant on December 12, 1972. Defendant denied having intercourse with plaintiff on that date.

However, various admissions of defendant in letters to plaintiff and statements that she made to her friends would indicate that she had engaged in intercourse with the plaintiff during the period in question. Plaintiff testified that defendant told him that she had intercourse with her husband on the same evening. Defendant also testified that she cohabited with her husband. Defendant and her doctor testified that she was artificially inseminated with the sperm of her husband and an anonymous donor on December 13, 1972.[1] Further, the evidence was that James was diagnosed as having a low sperm count. But, a low sperm count, as the doctor testified, is not indicative of sterility or an inability to procreate.

■■ Thus, the plaintiff failed to offer clear and convincing proof of inability of the husband to procreate or inaccessibility to overcome the presumption of legitimacy. As this was necessary to plaintiff's prima facie case, the trial court did not err in entering judgment for the defendant.

■■ After plaintiff had rested his case, and after defendant had filed a motion for a directed finding, plaintiff moved that James be required to submit to a blood test for the purpose of excluding him as the child's father. The ordering of a blood test is a matter of discovery regulated by Supreme Court Rule 215 (Ill. Rev. Stat. 1979, ch. 110A, par. 215). (*Zavaleta v. Zavaleta* (1976), 43 Ill. App. 3d 1017, 1020, 358 N.E.2d 13, 15.) A trial court has broad discretion to order a party to submit to a blood test. (*People ex rel. Coleman v. Ely* (1979), 71 Ill. App. 3d 701, 704, 390 N.E.2d 140, 142.) The rules require a showing of good cause (*People ex rel. De Vos v. Laurin* (1979), 73 Ill. App. 3d 219, 224, 391, N.E.2d 164, 168), and that the motion be made within a reasonable time before trial. (Supreme Court Rule 215.) Because we think that plaintiff's motion was not timely made, and that the trial court did not err in denying the motion, we need not reach the question of whether plaintiff had standing to order a blood test of the lawful father.

Plaintiff filed a motion requesting that the court order Harriet, the child, and plaintiff to submit to Human Leucocyte Antigen (HLA) tests. Plaintiff also requested that the results of the tests be admitted into evidence to establish his paternity. The motion was denied. Throughout the proceedings, plaintiff renewed his request for the HLA tests, citing recent decisions from other jurisdictions of the highly probative value of

---

[1] Plaintiff relies on *Doornbos v. Doornbos* (1954), 12 Ill. App. 2d 473, 139 N.E.2d 844, where a trial court ruled that a child conceived through artificial insemination was not a child born in wedlock. This issue was not before the appellate court, however, and consequently has not been ruled on by an Illinois appellate court. The case has been strongly criticized by medical and legal commentators. (See Shaman, *Legal Aspects of Artificial Insemination*, 18 J. Fam. L. 331 (1979-80).) In Levisohn, *Dilemma in Parenthood: Socio-legal Aspects of Human Artificial Insemination*, 36 Chi.-Kent L. Rev. 1, 26 (1959), the author stated that "in cases where the husband's semen has been mixed with that of a donor, there could be no possibility whatever of proof that the husband was not the biological father."

the tests. See *Cramer v. Morrison* (1979), 88 Cal. App. 3d 873, 153 Cal. Rptr. 865; *County of Fresno v. Superior Court of Fresno County* (1979), 92 Cal. App. 3d 133, 154 Cal. Rptr. 660; *Malvasi v. Malvasi* (1979), 167 N.J. Super. 513, 401 A.2d 279.

The Act on Blood Tests to Determine Paternity (Ill. Rev. Stat. 1977, ch. 40, par. 1401 *et seq.*) provided that the court may order the mother, child and alleged father to submit to blood tests. (See *People ex rel. De Vos v. Laurin* (1979), 73 Ill. App. 3d 219, 391 N.E.2d 164.) However, the results were not admissible unless definite exclusion was established. Ill. Rev. Stat. 1977, ch. 40, par. 1401; *De Vos*, at 223.

Plaintiff, Harriet, and the child submitted to blood tests at Evanston Hospital in June 1979. The results of the test did not exclude plaintiff as the father. We have held that even assuming that under the blood test act defendant could not be compelled to submit to a second test, the discovery provisions of Supreme Court Rule 215 would still be available to plaintiff. (*People ex rel. Yarn v. Yarn* (1979), 73 Ill. App. 3d 454, 456, 392 N.E.2d 606, 607.) However, the provisions of Rule 215 are not mandatory, but vest broad discretion in the trial court to determine whether a physical examination should be ordered. (See *People ex rel. Coleman v. Ely* (1979), 71 Ill. App. 3d 701, 390 N.E.2d 140.) The request for a second test must be timely and show good cause. (See *People ex rel. De Vos v. Laurin.*) Thus, a court could properly determine that a second blood test was not warranted. *De Vos*, at 224.

In September 1980, after this case was decided, the legislature passed an act (Pub. Act. 81-1445) amending sections 1, 2, and 4 of the Act on Blood Tests to Determine Paternity. The amendment provides that the court may order the mother, child, and alleged father to submit to blood tests including the Human Leucocyte Antigen Tests. The amendment provides that the results shall be receivable in evidence. (Ill. Rev. Stat., 1980 Supp., ch. 40, par. 1401.) However, section 4(b) provides that the results of blood tests alone shall not be sufficient grounds for determining that the man is the father of the child. Ill. Rev. Stat., 1980 Supp., ch. 40, par. 1404(b).

Plaintiff contends, in the alternative, that the blood test act does not apply in our case. The trial court had power to order any other medical tests for discovery purposes under Supreme Court Rule 215. Plaintiff claims that denial of the motion was an abuse of discretion and reversible error.

■■ Because we have held that application of Supreme Court Rule 215 is discretionary (*People ex rel. Yarn v. Yarn* (1979), 73 Ill. App. 3d 454, 456, 392 N.E.2d 606, 608), the decision of the trial court will not be reversed absent an abuse of discretion. (*Jackson v. Whittinghill* (1963), 39 Ill. App. 2d 315, 188 N.E.2d 337.) Where, as here, the results of the additional tests

would not be admissible, unless definite exclusion was established, under the law in effect at the time of the proceeding, and under the law now in effect the results of the additional test would be one factor and not the sole conclusory determination establishing paternity, we hold that the denial of the HLA test was not reversible error, as it would not have changed the outcome of the case.[2]

Plaintiff contends that the Paternity Act (Ill. Rev. Stat. 1979, ch. 40, par. 1351 *et seq.*) denies equal protection of the laws to males because it provides no way for them to establish their paternity.

A paternity action is essentially a civil action to compel the putative father to support his child. (*People ex rel. Yarn v. Yarn* (1979), 73 Ill. App. 3d 454, 456, 392 N.E.2d 606, 607.) Though the statute (Ill. Rev. Stat. 1979, ch. 40, par. 1354) provides that actions for support, maintenance, education and welfare may be instituted by the mother or by the Illinois Department of Public Aid on behalf of the minor child, a father has not been barred by the Act from having his paternity established when he has overcome the presumption of legitimacy. (See *In re Ozment* (1978), 61 Ill. App. 3d 1044, 378 N.E.2d 409.) In *Ozment*, the putative father had custody of the child and had cared for the child since its birth. The putative father offered testimony of the mother and the presumptive father showing lack of access by the presumptive father. Thus, the court held that the putative father had presented sufficient proof to overcome the presumption of legitimacy. Though the language of the Act grants a cause of action to the mother and child, our decisions since *People ex rel. Slawek v. Covenant Children's Home* (1972), 52 Ill. 2d 20, 284 N.E.2d 291, have recognized the rights of a biological father to seek custody of an illegitimate child.

In *Illinois Housing Development Authority v. Van Meter, Jr.* (1980), 82 Ill. 2d 116, 119-20, 412 N.E.2d 151, 152-53, the court stated:

> "The * * * test in assessing an equal protection claim is to determine if the [statute] * * * operates to the disadvantage of a suspect class or infringes upon a fundamental right. (*San Antonio Independent School District v. Rodriguez* (1973), 411 U.S. 1, 17, 36 L. Ed. 2d 16, 33, 93 S. Ct. 1278, 1288.) If the legislation in question creates a 'suspect classification,' such as race (*Loving v. Virginia* (1967), 388 U.S. 1, 11, 18 L. Ed. 2d 1010, 1017, 87 S. Ct. 1817, 1823), alienage (*Graham v. Richardson* (1971), 403 U.S. 365, 371-72, 29 L. Ed. 2d 534, 541-42, 91 S. Ct. 1848, 1851-52), national origin (*Oyama*

---

[2] In *Cramer, Fresno* and *Malvasi*, the HLA tests were the only means of establishing paternity in cases that were factually distinguishable from this case. See also Jaffee, *Comment on the Judicial Use of HLA Paternity Test Results and Other Statistical Evidence: A Response to Terasaki*, 17 J. Fam. L. 457 (1978-79).

116

> v. *California* (1948), 332 U.S. 633, 646, 92 L. Ed. 249, 259, 68 S. Ct.
> 269, 275), or infringes upon a fundamental right, such as the right to
> travel (*Shapiro v. Thompson* (1964), 394 U.S. 618, 634-35, 22 L. Ed.
> 2d 600, 615, 89 S. Ct. 1322, 1331-32), the right to vote (*Harper v.
> Virginia State Board of Elections* (1966), 383 U.S. 663, 670, 16 L.
> Ed. 2d 169, 174, 86 S. Ct. 1079, 1083), or the right to fair treatment
> in the criminal process (*Douglas v. California* (1963), 372 U.S. 353,
> 355-56, 9 L. Ed. 2d 811, 813-14, 83 S. Ct. 814, 815-16), then the
> statute must promote a compelling or overriding State interest. If a
> *suspect classification or fundamental right is not found, the legis-*
> lation simply must bear a rational relationship to a legitimate
> governmental interest. *Dandridge v. Williams* (1970), 397 U.S. 471,
> 485-87, 25 L. Ed. 2d 491, 501-03, 90 S. Ct. 1153, 1161-62."

Plaintiff contends the Paternity Act makes classification by gender and, thus, must serve an important governmental objective to meet the test of equal protection. However, we have found no cases which hold that a declaration of paternity is a fundamental right or that a class of illegitimate fathers is a suspect class. Since *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, we have held that where statutes make unreasonable distinctions between parents of illegitimates and parents of legitimates, the statutes violate equal protection. In *People ex rel. Slawek v. Covenant Children's Home* (1972), 52 Ill. 2d 20, 284 N.E.2d 291, the court held that insofar as provisions of the adoption and paternity acts conflict with *Stanley*, the provisions were unconstitutional.

Thus, the proper test in this case is whether the legislation bears a rational relationship to a legitimate governmental interest. When a rational basis test is used, a legislative classification is presumed valid. (*Illinois Housing Development Authority v. Van Meter, Jr.* (1980), 82 Ill. 2d 116, 122, 412 N.E.2d 151, 154.) The burden of rebutting the presumptive validity of the classification rests upon the party challenging its constitutionality. (*Illinois Housing Development Authority*, at 122.) A statutory classification will not be declared unconstitutional "if any state of facts reasonably may be conceived to justify it." *Illinois Housing Development Authority*, at 122.

The purpose of a paternity proceeding under the Act is to determine the identity of the putative father, provide support for the illegitimate child, and prevent the child from becoming a public charge. (*People ex rel. Cizek v. Azzarello* (1980), 81 Ill. App. 3d 1102, 1105, 401 N.E.2d 1177, 1181.) Plaintiff admits that this is a permissible State objective. But, plaintiff claims that to bar his assertion of paternity under the Act bears no rational relationship to the State's objective because any male asserting paternity would be obliged to support the child. As we have shown in *In re Ozment* (1978), 61 Ill. App. 3d 1044, 378 N.E.2d 409, the Paternity Act

was not a bar to a putative father asserting his claim of paternity.[3] A statute is not unconstitutional because it affects one class and not another, provided that it affects all members of the same class alike and provided that there is a reasonable basis for differentiating between the class to which the statute is applicable and the class to which it is not. *In re Marriage of Galvin* (1981), 94 Ill. App. 3d 1032, 1035, 419 N.E.2d 417, 419, citing *Hamilton Corp. v. Alexander* (1972), 53 Ill. 2d 175, 290 N.E.2d 589; *Bridgewater v. Hotz* (1972), 51 Ill. 2d 103, 281 N.E.2d 317.

■■ The objective of the Paternity Act is support for the minor child. And the Act provides a mechanism whereby the father of an illegitimate child may be required to fulfill the same child support obligation as a married father. If the child is being supported by a legal father who has assumed the parenting responsibility of daily supervision, education, protection and care of the child (responsibilities listed in *Quilloin v. Walcott* (1978), 434 U.S. 246, 256, 54 L. Ed. 2d 511, 520, 98 S. Ct. 549, 555), then the provisions of the Paternity Act would not apply. The *Quilloin* court stated that in certain circumstances the State could recognize the difference in the extent of commitment to the welfare of the child and treat the illegitimate father differently than the State would treat a separated or divorced father. Such difference in treatment is not a violation of equal protection principles. It is our view that the legislation is not unreasonable in the light of the legislative objective and that it was within the province of legislative power. *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 576, 376 N.E.2d 1382, 1389.

Finally, we turn to plaintiff's contention that the statutory scheme interferes with his right to exercise his paternity and thus violates his right of due process. The cases hold that freedom of personal choice in matters of family life is one of the liberties protected by the due process clause of the fourteenth amendment to the United States Constitution. (*Quilloin v. Walcott* (1978), 434 U.S. 246, 255, 54 L. Ed. 2d 511, 519, 98 S. Ct. 549, 555.) But, where one's assertion of the rights of paternity conflict with the countervailing interests of an existing family unit, the courts must balance the interests of the putative father, the child, the parents, and the State. The *Quilloin* court applied the standard of "best interests of the child."

[3] See Annot., "Who May Dispute Presumption of Legitimacy of Child Conceived or Born During Wedlock," 90 A.L.R. 3d 1032 (1979).

*Johannesen v. Pfeiffer* (Me. 1978), 387 A.2d 1113 (putative father had right to seek declaration of paternity to protect any rights he may have under the inheritance laws or the laws relating to adoption of illegitimates).

*A. B. v. C. D.* (1971), 150 Ind. App. 535, 277 N.E.2d 599 (putative father's expectancy as an heir apparent was sufficient interest to maintain an action to have his paternity judicially declared).

*In re R.* (1975), 13 Cal. 3d 636, 532 P.2d 123, 119 Cal. Rptr. 475 (interests of putative father outweighed interests of the State where evidence was that child was born while mother lived with putative father, and putative father's name was carried on birth records as father of child).

In *In re Petition of Negron* (1975), 33 Ill. App. 3d 112, 337 N.E.2d 375, the court faced a putative father who sought to disrupt a settled family structure. The *Negron* court stated that the policy of preserving and protecting an established family unit underlies *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, and *People ex rel. Slawek v. Covenant Children's Home* (1972), 52 Ill. 2d 20, 284 N.E.2d 291. In Illinois, the paramount concern in matters dealing with child custody must always be the welfare of the child. (*Negron*, at 117.) Illinois focuses on the need for emotional support, continuity and stability in a familial setting.

In our case, though the parents are divorced, a family unit remains. The mother has custody of the child. The child visits his father on vacations, and the father visits him when he comes to the area on business. The father has continued to shoulder the parental responsibility of the child who is now 8 years old.

■■ Contrastingly, the plaintiff has never shouldered any responsibility for the child. (We do not equate babysitting in exchange for a free room an assumption of parental responsibility.) In this action, plaintiff seeks a declaration of his paternity and a right of visitation. These rights are correlative to, and can only be asserted with, the assumption of parental responsibilities. Thus, it is in the best interests of the child that the existing family unit remain unencumbered by challenges to his legitimacy. Plaintiff's rights under the due process clause of the fourteenth amendment must be balanced against the countervailing interests of the family unit and the child.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

LINN, J., concurs.

Mr. PRESIDING JUSTICE ROMITI, dissenting:

Because I believe that the trial court barred plaintiff's request for Human Leucocyte Antigen (HLA) tests solely because it erroneously believed it had no discretion to allow such tests, I would reverse and remand.

Well before trial plaintiff petitioned the court to allow HLA testing. The court denied this request but subsequently indicated it would reconsider if plaintiff produced expert testimony establishing that the test was "foolproof." However, at trial plaintiff was barred from presenting the testimony of Dr. Chang Ling Lee, identified as an expert on paternity testing, concerning the reliability and viability of HLA testing. Indeed, the

court even barred plaintiff from making an offer of proof as to Dr. Lee's testimony. The court stated that although it would like to hear this testimony, it believed that the Act on Blood Tests to Determine Paternity (the Act) (Ill. Rev. Stat. 1979, ch. 40, pars. 1401-1407) barred the use of such evidence to affirmatively establish paternity. At the time section 1 of the Act provided:

> "In a civil action, in which paternity is a relevant fact, the court, upon its own initiative, or upon motion of any party to the action, may order the mother, child and alleged father to submit to blood tests to determine whether or not the defendant shall be excluded as being the father of the child. The results of the tests shall be receivable in evidence only if definite exclusion is established. If the defendant refuses to submit to such tests, such fact shall not be disclosed upon the trial." (Ill. Rev. Stat. 1979, ch. 40, par. 1401.)

It is clear from the record that the trial court believed that this provision applied to HLA testing. I believe the court erred in this conclusion. In *Cramer v. Morrison* (1979), 88 Cal. App. 3d 873, 153 Cal. Rptr. 865, the court determined that its Uniform Act on Blood Tests to Determine Paternity (Cal. Evid. Code §§890-897 (1966)), which, like ours, was drawn from the Model Act on Blood Tests to Determine Paternity (see 9A Uniform Laws Annotated 623, 624 (1979)), was not applicable to HLA tests. The court noted that when the California statute was adopted in 1953 the Landsteiner series of red cell blood grouping tests were in use, having been endorsed the year before by the American Medical Association as sufficiently accepted within the scientific community to be legally valid. Indeed, the court noted that as late as 1975 the Landsteiner tests were still the standard tests for non-paternity (citing Lee, *Current Status of Paternity Testing*, 9 Fam. L. Q. 615 (1975)), and the HLA test, which involves tissue typing of the white blood cells, was not yet in use for paternity testing in California. This reasoning is equally applicable to our Act, which was adopted only four years after that of California. Our legislature cannot be said to have contemplated barring use of evidence obtained by scientific techniques not then known to it. I would hold that the Act, as it existed at the time of trial, was not applicable to HLA testing and thus did not bar the use of the results of such tests as affirmative evidence of paternity. See *J.H. v. M.H.* (1980), 177 N.J. Super. 436, 426 A.2d 1073; *Phillips v. Jackson* (1980), ___ Utah ___, 615 P.2d 1228; contra *J.B. v. A.F.* (1979), 92 Wis. 2d 696, 285 N.W.2d 880.

The majority in its opinion appears to concede that if the Act did not apply then the trial court possessed the discretion to order HLA testing under Supreme Court Rule 215 (Ill. Rev. Stat. 1979, ch. 110A, par. 215). This rule gives the court the authority to order the physical examination of a party (or a person in the custody or legal control of a party) where the

physical condition of that individual is in controversy. The examination may be ordered prior to trial or even during trial. Here the physical condition at issue was the blood relationship of the plaintiff to the child of defendant H.M. But, contrary to the apparent holding of the majority, I believe it to be clear that the trial court, because of its construction of the Act, never exercised its discretion to determine whether the tests should be ordered.

The majority concludes, on the basis of the evidence plaintiff was allowed to present, that he failed to rebut the presumption of legitimacy accorded the child. But this begs the question. Where the HLA test does not exclude an individual as the father of a child, the probability of that person being the father will usually be over 90 percent. (Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing*, 16 J. Fam. L. 543 (1977-78).) In some instances the probability can be determined to be higher than 99 percent. (Terasaki, at 551.) At the time of trial the Act provided that blood test results could be utilized to rebut the presumption of legitimacy accorded a child during wedlock. (Ill. Rev. Stat. 1979, ch. 40, par. 1405; *People v. Askew* (1979), 74 Ill. App. 3d 743, 393 N.E.2d 1124.) Although I believe that the Act was not drafted in contemplation of HLA testing, the principle established by this provision, that scientific evidence disproving the paternity of a husband will suffice to rebut the presumption of legitimacy, applies equally to the use of HLA test results. Indeed, the Act as amended in 1980 retains this provision without alteration so that the "tests" to which it refers include, by reference to the amended provisions, the HLA tests. From this analysis it seems clear that an erroneous statutory construction by the trial court prevented plaintiff from obtaining evidence which could have rebutted the presumption of legitimacy invoked by the court to support its judgment for defendants. Accordingly I believe the judgment should be reversed and the cause remanded for a new trial. The newly amended Act would be applicable to that proceeding and would provide a proper framework for consideration of any renewed request by plaintiff for HLA testing.

I would also note that I find no basis for this court to consider plaintiff's constitutional attack on the Paternity Act. (Ill. Rev. Stat. 1979, ch. 40, pars. 1351-1368.) Plaintiff's constitutional arguments are based on the premise that the trial court construed that act so as to deny him the right to bring this action. But in fact plaintiff did not claim to be bringing this action by authority of the Paternity Act. More importantly, he was afforded a trial on the merits; he was not barred from bringing this action. For these reasons I believe the majority's discussion of these issues can only be considered dictum.