In re ADOPTION OF ALEX J. McFADYEN III.—(LEON R. SHURE et al., Petitioners-Appellees, v. ALEX J. McFADYEN et al., Respondents-Appellants.)

First District (2nd Division)   No. 81—1928

Opinion filed August 3, 1982.

Lake, Rosenberg & Associates and Beermann, Swerdlove, Woloshin, Barezky & Berkson, both of Chicago (Miles N. Beermann, Howard A. London, and Edward D. Rosenberg, of counsel), for appellants.

Mandel, Lipton and Stevenson, Ltd., of Chicago (Richard L. Mandel, Nicholas Stevenson, and Richard A. Lifshitz, of counsel), for appellees.

JUSTICE DOWNING delivered the opinion of the court:

This is an appeal from the granting of a petition for adoption. Petitioners Leon and Marianne Shure filed a petition to adopt Alex J. McFadyen III ("Alex III"). The petition was contested by respondents Alex and Diane McFadyen. Two issues are presented on appeal: (1) whether the circuit court correctly construed the term "parents" in the Adoption Act to mean only biological and legally adoptive parents (Ill. Rev. Stat. 1979, ch. 40, par. 1510(a)); and (2) whether such a construction deprives Alex McFadyen of due process.

Alex and Diane were married on March 7, 1979. Diane gave birth to a son, Alex III, on February 23, 1980, in Casper, Wyoming. Alex and Diane concede on appeal that Alex is not the biological father of Alex III.

The Shures filed a petition to adopt Alex III on August 13, 1980. Diane executed a "final and irrevocable" consent to the adoption of Alex III on August 14, 1980. Alex and Diane concede on appeal that this consent was valid. The biological father, Robert Giddick or an unknown person, was served by publication in the circuit court and a default judgment entered against him. The circuit court entered an order terminating the parental rights of Diane, appointing a guardian *ad litem* for Alex III,[1] and granting temporary custody of Alex III to the Shures.

The Shures' petition, with amendments,[2] alleged that Alex was the presumptive legal father of Alex III, and that Alex was an "unfit person" within the meaning of section 1(D) (Ill. Rev. Stat. 1979, ch. 40, par. 1501(D)). The petition also alleged that Robert Giddick was the biological father of Alex III and that he was an unfit person.

Alex filed a general appearance on February 25, 1981. Alex' sec-

---

[1]The record indicates the guardian *ad litem* was present at all court proceedings.

[2]In the original petition filed August 13, 1980, it was alleged that the address of Alex was unknown, and that Alex had abandoned Alex III on or about May 1, 1980.

tion 45 motion to dismiss the petition for adoption was denied (Ill. Rev. Stat. 1979, ch. 110, par. 45). After further proceedings not relevant to this appeal, the Shures filed a motion for judgment of adoption, which the circuit court treated as a motion for summary judgment. The motion alleged that Diane, the natural mother, consented to the adoption, that Alex had no standing since he was not the biological father, and that the biological father was in default. In support of the contention that Alex was not the biological father, excerpts from the deposition transcripts of Alex and Diane were submitted.

Alex testified at his deposition that he had a vasectomy in 1972, and that he believed himself to be sterile. He further testified that he and Diane had an agreement that she could have intercourse with other men for the purpose of becoming pregnant. One of the men with whom she had intercourse was Robert Giddick. Diane's deposition testimony corroborated the existence of this "agreement," and that she had intercourse with Giddick and several other men.

In denying the Shures' motion for summary judgment, the court stated that if Alex was not the biological father, neither his consent nor a finding of unfitness was needed. A trial on the issue of paternity followed.

Six days before the trial began, Alex and Diane filed a joint verified answer to the petition for adoption. Alex had previously filed a verified answer to the petition. Alex and Diane denied that Alex was an unfit person. They claimed that it was possible for Alex to be the biological father, but that if he was not, that Alex III was conceived through "their type of artificial insemination." In an affirmative defense, they defined this type of "artificial insemination" as consisting of "someone other than the husband was, by their choice, the sperm donor to help them conceive their child." It was more clearly explained in a further affirmative defense as "artificial insemination by means of a surrogate donor's penis." The Shures did not file a responsive pleading to this answer.

Although the trial court had ruled that the sole issue at trial was to be paternity, this ruling was not strictly followed. Much of the testimony of the 10 witnesses concerned the issue of paternity, but other evidence was introduced by both parties. A brief chronology of the events leading up to the surrender of Alex III for adoption follows.

Alex and Diane were married on March 7, 1979, in Chicago. Several weeks later they moved to Covert, Michigan. Alex spent May and part of June in jail on a misdemeanor charge. It was during this time that Diane had intercourse with Giddick and several other men. Alex and Diane moved to Casper, Wyoming, at the end of July 1979. They

lived in Casper until April or June of 1980. Alex III was born in Casper on February 23, 1980. From Alex III's birth until they left Wyoming, Diane took Alex III to visit relatives in Chicago on several occasions.

Diane testified that in late April 1980, she hitchhiked to Chicago with Alex III, where they took up permanent residence with Laura Kroll, Diane's grandmother. Mrs. Kroll's testimony was consistent about this date. Alex moved to Mrs. Kroll's in late June. (Alex testified that the entire family moved together from Wyoming to Chicago in late June 1980.) Alex attended truck driving school in Wisconsin for three weeks from approximately June 30 to July 17, 1980. Diane and Alex III accompanied him to Wisconsin. Upon graduation, Alex traveled to at least 10 states in search of employment. Diane and Alex III returned to Mrs. Kroll's and did not travel with Alex. In late July 1980, Alex secured employment as a cross-country truck driver with a firm in Wichita, Kansas.

While working as a truck driver, Alex did not see Diane or Alex III. When Alex returned to Wichita on August 27 after finishing a run, Diane was waiting for him. She told Alex that she had placed Alex III up for adoption.

Evidence was introduced on issues other than paternity as follows. Alex was called as an adverse witness during the Shures' case in chief. Ruling on an objection to a line of questioning, the circuit court held that evidence of Alex' fitness as a parent was relevant and allowed questioning on the subject. Consequently, substantial evidence was introduced in an attempt to establish Alex' unfitness, including his prior criminal history and his prior marital and child-support history. During their case, Alex and Diane introduced evidence in an attempt to establish Alex' fitness. This evidence consisted of testimony that Alex played with, fed, and changed the diapers of Alex III.

Alex and Diane introduced evidence in an attempt to establish the existence of their "surrogate insemination" agreement. On direct examination, Alex was asked the following questions:

"Q During your married life to the best of your knowledge, did Diane have intercourse with other men?

A Yes.

MR. COUGHLIN [counsel for the Shures]: Objection, Your Honor. No, I'm sorry, I withdraw the objection.

MR. ROSENBERG [counsel for the McFadyens]: Was this with your prior permission?

A Yes, it was."

At the completion of the testimony, the circuit court issued a

memorandum opinion, later incorporated into the judgment of adoption. The court found that Alex was not the biological father of Alex III, and thus was a stranger to the proceedings. The court construed "parents" in section 8 (Ill. Rev. Stat. 1979, ch. 40, par. 1510) to mean biological and legally adoptive parents. The court also rejected the claim that Alex III was the product of Alex' and Diane's unique form of extramarital artificial insemination. The court held that Alex and Diane did not factually establish the existence of such an agreement, and, as a matter of law, that such an arrangement was not legally equivalent to artificial insemination.

Alex and Diane then stipulated that the Shures were fit persons within the meaning of the Adoption Act. The trial court accordingly entered a judgment of adoption in favor of the Shures, from which Alex and Diane appeal.

## I

Alex first contends that the circuit court incorrectly interpreted the adoption statute. Section 8(a) of the Adoption Act (Ill. Rev. Stat. 1979, ch. 40, par. 1510(a)) requires the consent, or a finding of unfitness, of "the parents" for adoption of a child. "Parent" is defined as "the father or mother of a legitimate or illegitimate child." (Ill. Rev. Stat. 1979, ch. 40, par. 1501(E).) The circuit court held that the term "parent" is limited to biological and legally adoptive parents. Alex contends that, "[i]f a man's wife gives birth to a child which was conceived during the marriage, the man accepts the child as his own, and no other man asserts his paternity, the husband should be deemed to be the legal 'father' of the child within the meaning of the adoption statute." Two different theories are used by Alex in support of this proposed statutory interpretation. One theory is based on the presumption that a child conceived by a married woman during the marriage is legitimate. A second theory attempts to draw an analogy to cases involving artificial insemination.

## A.

In support of the first theory, Alex relies on a recent decision of the Delaware Supreme Court. (*Petitioner F. v. Respondent R.* (Del. 1981), 430 A.2d 1075.) The Delaware court recognized the presumption that a child born to a married woman is legitimate, in effect holding that this presumption was irrebuttable. (430 A.2d 1075, 1077-78.) The court relied on a statement by Lord Mansfield in a case decided over two centuries ago. (*Goodright v. Moss* (1777), 98 Eng. Rep. 1257.) Alex in effect argues that an irrebuttable presumption should

exist that he is the biological father of Alex III.

■ The law in Illinois is not the same as the law in Delaware. In Illinois, there is a presumption that such a child is legitimate, but that presumption may be overcome by clear and convincing evidence. (*Happel v. Mecklenburger* (1981), 101 Ill. App. 3d 107, 112, 427 N.E.2d 974.) The petitioner in *Happel*, a stranger to the marriage, was allowed to assert that he had parental rights. The court concluded that petitioner failed to overcome the presumption of legitimacy by clear and convincing evidence.

■ In the present case, Alex is entitled to a presumption that Alex III is legitimate, and therefore that he is the biological father. In light of the evidence adduced at trial of Alex' vasectomy, Diane's relations with other men, and Diane's assertion that someone else was the biological father, the presumption of legitimacy was rebutted by clear and convincing evidence.

### B.

Alex' second theory is based on an attempt to draw an analogy to artificial insemination cases. *In re Adoption of Anonymous* (1973), 74 Misc. 2d 99, 345 N.Y.S.2d 430, involved a man whose wife gave birth to a child after she was artificially inseminated in a medical procedure with the semen of a third party donor, with her husband's consent. The court held that the husband was a "parent" whose consent was required for adoption of the child. Alex argues that the "agreement" he had with Diane that she could have intercourse with other men to become pregnant is tantamount to an agreement to have a child born through artificial insemination.

Initially, Alex contends that the Shures judicially admitted the existence of this "surrogate insemination" agreement. Alex and Diane filed a joint verified answer to the petition to adopt six days before the trial started, replacing a verified answer filed earlier by Alex. The joint answer alleged the fact of the existence of an "agreement," and the legal conclusion that the agreement makes Alex, for all practical purposes, the "legal biological father." Because the Shures did not file a pleading denying the allegations in the answer, Alex claims that they have admitted these allegations.

Section 2—610(b) of the Code of Civil Procedure provides: "Every allegation, except allegations of damages, not explicitly denied is admitted, unless the party states in his or her pleading that he or she has no knowledge thereof sufficient to form a belief, and attaches an affidavit of the truth of the statement of want of knowledge, or unless the party has had no opportunity to deny." (Ill. Rev. Stat. 1981,

ch. 110, par. 2—610(b).) Section 2—602 of the Code of Civil Procedure provides, in part: "if new matter by way of defense is pleaded in the answer, a reply shall be filed by the plaintiff ***." Ill. Rev. Stat. 1981, ch. 110, par. 2—602.

■■ Case law consistently holds that failure to deny factual allegations constitutes an admission of those allegations. (*Mooney v. Underwriters at Lloyd's, London* (1965), 33 Ill. 2d 566, 570, 213 N.E.2d 283; *First Federal Savings & Loan Association v. American National Bank & Trust Co.* (1968), 100 Ill. App. 2d 460, 467, 241 N.E.2d 615.) A party, however, can waive the benefit of the admission in two different ways. First, the benefit of the admission is waived by the introduction of evidence in support of the uncontradicted allegation. (*Mooney v. Underwriters at Lloyd's, London* (1965), 33 Ill. 2d 566, 570; *First Federal Savings & Loan Association v. American National Bank & Trust Co.* (1968), 100 Ill. App. 2d 460, 467-68.) Second, a waiver is caused by failure to raise the admission in the trial court. *Interstate Printing Co. v. Callahan* (1974), 18 Ill. App. 3d 930, 932, 310 N.E.2d 786; *First Federal Savings & Loan Association v. American National Bank & Trust Co.* (1968), 100 Ill. App. 2d 460, 468.

■■ Alex and Diane have waived the benefit of any admission that may have occurred. First, they introduced evidence regarding the "surrogate insemination" agreement at trial through Alex' testimony concerning its existence. Second, we can find no evidence in the record that the McFadyens called the admission to the attention of the trial court. We conclude that if an admission occurred, the benefit of it was waived.

■■ Next, Alex argues that he was precluded from introducing evidence at trial concerning the "surrogate insemination" agreement by the pretrial ruling of the circuit court limiting the trial to the issue of paternity. At oral argument in this court, Alex urged a remand to enable him to introduce evidence on this subject. From our examination of the record, we note that the trial court did not enforce this ruling and admitted evidence on other issues at trial. We find nothing in the record to suggest Alex was prevented from introducing more evidence regarding this "agreement." Alex is thus not entitled to a remand for this reason.

■■ We need not address the legal consequences[3] of a "surrogate insemination" agreement (see *In re Marriage of L.M.S.* (Wis. App.

---

[3]Likewise, we will not discuss the public policy question implicit in such an arrangement, although we note that adultery is against the public policy of the State. See Ill. Rev. Stat. 1981, ch. 40, par. 401(2).

1981), 105 Wis. 2d 118, 312 N.W.2d 853) because the trial court found, as a matter of fact, that Alex and Diane did not establish the existence of such an agreement between themselves. The factual findings of the trial court will not be reversed unless they are against the manifest weight of the evidence. (*In re Adoption of Garrison* (1981), 93 Ill. App. 3d 670, 673, 417 N.E.2d 787; *Stines v. Vaughn* (1974), 23 Ill. App. 3d 511, 519, 319 N.E.2d 561, *appeal denied* (1975), 58 Ill. 2d 595.) We find no basis upon which to reverse this finding of fact.

## C.

■■ We believe that the trial court correctly interpreted the term "parents." The language of the statute defines parents as "the father or mother of a legitimate or illegitimate child." (Ill. Rev. Stat. 1979, ch. 40, par. 1501(E).) By this plain language, we cannot say that the General Assembly intended to extend the definition of the term "parent" beyond biological or legally adoptive parents. See *In re Adoption of Weller* (1977), 47 Ill. App. 3d 492, 497-98, 362 N.E.2d 73.

Our conclusion is buttressed by reference to the recent decision of *In re Application of Santore* (1981), 28 Wash. App. 319, 623 P.2d 702. Karen Santore, married to Richard Santore, became pregnant by Michael Murphy, who died without knowing of the pregnancy. Dissolution of marriage proceedings were pending between Karen and Richard at the time of conception, although the dissolution apparently did not occur. Soon after the birth of the child, Karen signed a consent to adoption, along with an affidavit of paternity. She gave up custody of the child. One month later, Karen filed a revocation of consent and, along with Richard, a petition for writ of *habeas corpus* seeking to void the adoption.

Richard argued that his consent was necessary for the adoption, and that it was not given. Washington law provides that consent is required from the "parents." (Wash. Rev. Code Ann. sec. 26.32.030 (1961).) The court held that Richard was entitled only to notice of the proceedings and an opportunity to establish his paternity. Once the court determined that he was not the biological father, it concluded that his consent was not necessary. (*In re Application of Santore* (1981), 28 Wash. App. 319, 329-30, 623 P.2d 702, 709.) This case is very similar to the present case, and we agree with the reasoning of the Washington court.

■ In conclusion, we hold that the circuit court correctly interpreted the term "parents" to mean biological and legally adoptive parents. Accordingly, Alex is not a "parent" and has no right to contest the adoption of Alex III.

II

Alex contends that if he is not a "parent" under the adoption statute, that the statute is unconstitutional as applied to him. He claims that the statute violates his "right of family privacy and association guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Phrasing the issue somewhat differently, Alex states: "The question presented by this case is whether the relationship between a child and his psychological parent constitutes a 'family' relationship entitled to *substantive* and *procedural* protection under the Due Process Clause of the Fourteenth Amendment."

Initially, the Shures contend that Alex waived his constitutional claim by failing to raise it in the circuit court. Our examination of the record indicates that neither this constitutional claim nor any similar claim was presented to the circuit court.[4] It is a well settled principle of judicial restraint that constitutional questions not presented to the trial court may not be raised for the first time on appeal. *Brunswick v. Mandel* (1974), 59 Ill. 2d 502, 505, 322 N.E.2d 25; *City of Chicago v. Birnbaum* (1971), 49 Ill. 2d 250, 251, 274 N.E.2d 22; *Smith v. Board of Fire & Police Commissioners* (1980), 85 Ill. App. 3d 928, 931, 407 N.E.2d 708; *Department of Transportation v. Collins* (1979), 69 Ill. App. 3d 269, 273, 387 N.E.2d 6.

Accordingly, it is our view that Alex waived this constitutional claim by failure to raise it in the circuit court.

In conclusion, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P. J., and HARTMAN, J., concur.

---

[4]Alex argued the following theories in the circuit court, some of which he attempted to elevate to constitutional dimension:

(a) Alex is the biological father.

(b) The statute should be construed to include Alex as the father.

(c) An irrebuttable presumption exists that the husband of a married woman is the father of her child. *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, is cited by Alex here, but this case, a procedural due process case, is not relevant to the due process argument raised by Alex in this court.

(d) Alex III was born through Alex' and Diane's own form of "artificial insemination," which is in fact "surrogate insemination." Alex attempts to put a constitutional gloss on this argument by stating: "The right of artificial insemination by penis is as much protected by the Constitution of the United States as the right of artificial insemination by glass test tube."