620 N.E.2d 572 (1993)
250 Ill. App.3d 981
189 Ill.Dec. 604
In the Interest of A.K., a Minor, The PEOPLE of the State of Illinois, Petitioner-Appellee,
v.
RANDY KIRCHNER, Respondent-Appellant.
No. 4-92-0846.
Appellate Court of Illinois, Fourth District.
Argued May 24, 1993.
Decided September 16, 1993.
*573 Randell S. Morgan, Kinate & Morgan, P.C. (argued), Attorneys at Law Fairbury, for respondent-appellant.
Thomas J. Brown, State's Atty., Pontiac, Norbert J. Goetten, Director State's Attorneys Appellate Prosecutor, Robert J. Biderman Deputy Director, Elliott Turpin Staff Atty. (argued), Springfield, for petitioner-appellee.
Paul G. Mason, Fairbury, guardian ad litem.
*574 Justice GREEN delivered the opinion of the court:
This case concerns the status of a husband in regard to a child born to his wife during the marriage when his parentage of the child is later contested. The legal questions involved are of increased importance because scientific tests are now available which can determine parentage with a very high degree of accuracy when administered at any time. Section 8(a)(2) of the Illinois Parentage Act of 1984 (Parentage Act) (Ill. Rev.Stat.1987, ch. 40, par. 2508(a)(2)) bars any action to determine parentage by any person other than the child when brought more than two years after the birth of the child, but section 8(a)(1) thereof (Ill.Rev. Stat. 1987, ch. 40, par. 2508(a)(1)) does not bar most actions brought on behalf of the child until two years after the child attains majority. Here the issue has been raised in an action under the Juvenile Court Act of 1987 (Act) (Ill.Rev.Stat.1987, ch. 37, par. 801-1 et seq.), section 2-13(1) of which provides for actions brought "in respect of" certain minors (Ill.Rev.Stat.1987, ch. 37, par. 802-13(1)).
On July 2, 1988, while a proceeding to dissolve the marriage of Brenda and Randy Kirchner was in progress in the circuit court of Livingston County, Brenda's grandmother filed a petition under the Act in that court. The petition alleged that A.K., age two years and seven months, the only child born to Brenda during the marriage, was an abused child (Ill.Rev.Stat. 1987, ch. 37, par. 802-3(2)(a)(i)) because Brenda had struck and choked the child and Randy was "not an appropriate custodian." Both Brenda and Randy were joined as respondent parents. On the date set for an adjudicatory hearing, the court noted that frequent mention had been made that James Bennett, rather than Randy, was the child's father. The court then set the matter over for a determination of the child's paternal parentage.
An amended petition was filed naming Bennett as the father of A.K., and Bennett was served with summons. An adjudicatory hearing was then held on October 27, 1988, and the court found that A.K. was an abused minor. Then, after a dispositional hearing, an order was entered on December 20, 1988, finding Bennett was the biological father of A.K. However, the court ruled that Randy had "standing to appear and participate in [the] proceedings as the minor child's stepfather." After a further hearing, an order was entered on February 8, 1989, making A.K. a ward of the court and placing him in the custody and under the guardianship of the Illinois Department of Children and Family Services (DCFS). Randy and Brenda were granted some rights of supervised visitation by that order.
On May 24, 1990, Bennett executed a surrender of his parental rights in regard to A.K., and that document was placed on file in the juvenile case. (See Ill.Rev.Stat. 1989, ch. 37, par. 802-29(2).) On September 17, 1990, DCFS filed a supplemental petition in the juvenile proceeding requesting the termination of the rights of Brenda and Randy as to A.K. Later DCFS filed a motion to strike reference to Randy in that petition and to insert there the name of Bennett as the father of A.K. The motion further stated that Randy was not a necessary party because the court had determined he was not the biological father of A.K. On December 14, 1990, the court ordered that Randy be dismissed from the proceedings. After the denial of a rehearing of the order, Randy has appealed, apparently pursuant to Supreme Court Rule 307(a)(6) (134 Ill.2d R. 307(a)(6)).
Randy presents a twofold argument on appeal. Brenda had alleged in the dissolution proceeding that Randy was not the father of A.K. Before that issue was decided in the juvenile case, the court ruled in the dissolution proceeding that the two-year limitation of section 8(a)(2) of the Parentage Act barred Brenda from making that claim. Randy maintained in the juvenile proceeding and now asserts on appeal that res judicata (collateral estoppel) effect should be given to that ruling in the dissolution proceeding, thus preventing the court in the juvenile proceeding from passing on the question of his parentage of A.K. Randy also contends that Brenda *575 fraudulently withheld from him that he was not A.K.'s father, and that in reliance thereon, he developed a relationship with A.K. such that he should be treated as a parent in equity. Under the record here, we affirm the judgment of the circuit court but conclude that the proper practice would have been to permit Randy to remain in the juvenile proceeding with opportunity to be heard until an order final as to all parties was entered.
The decision in Simcox v. Simcox (1989), 131 Ill.2d 491, 137 Ill.Dec. 664, 546 N.E.2d 609, is determinative of Randy's first contention. There, action was brought under the Parentage Act on behalf of a minor child against the person who was her mother's husband when she was born and against her mother's later husband, seeking to have the latter determined to be her natural father and for other relief. The circuit court held that the action was barred on collateral estoppel and res judicata grounds, because in the uncontested dissolution case between the child's mother and her husband at the time of the child's birth, the court found that the husband was the child's natural father.
In Simcox, the supreme court recognized the fully established rule that precludes an issue which has necessarily been decided by a court of competent jurisdiction from being relitigated later in a different action between the same parties or their privies. However, the Simcox court held that no bar of res judicata nature prevented that child from contesting her parentage as she was not a party to the dissolution proceedings where ruling was made on that issue, nor was she privy to a party in that case. Justice Ryan concurred specially, noting that no guardian ad litem had been appointed for the child in the dissolution proceeding. He stated that he was not deciding how he would rule if one had been appointed. (Simcox, 131 Ill.2d at 499, 137 Ill.Dec. at 667, 546 N.E.2d at 612 (Ryan, J., specially concurring).) Here, a guardian ad litem was appointed for A.K. in the dissolution proceeding, but we do not interpret the majority opinion in Simcox to indicate that would make a difference. Our decision here is consistent with decisions of the second district in In re Parentage of Mayberry (1991), 222 Ill.App.3d 1008, 165 Ill.Dec. 354, 584 N.E.2d 533, this district in Department of Public Aid ex rel. Skelton v. Liesman (1991), 218 Ill.App.3d 437, 161 Ill.Dec. 183, 578 N.E.2d 310, and that of the first district in Maller v. Cohen (1988), 176 Ill.App.3d 987, 126 Ill.Dec. 402, 531 N.E.2d 1029. In each of those cases, a determination of parentage in an action brought by or on behalf of a mother or her privy was held not to be binding upon subsequent actions by the child whose parentage was in issue.
The thrust of Randy's second contention is that he should be treated as an "equitable parent" of A.K. This argument requires careful study. Consider a situation where a child is born to a man's wife during their marriage and lives with the couple for 15 years when the mother becomes an unfit parent and the marriage fails. If a neglect or abuse petition is filed pursuant to the Act and the husband is shown not to be the natural father of the child, is the father to be dismissed from the juvenile proceeding without opportunity to be heard as to the disposition of the child, even though he has been a good father figure for the child throughout the child's life? Randy maintains that fairness requires that such a stepfather be treated as an "equitable parent." Some States have adopted such a rule.
In the case of In re Adoption of Young (1976), 469 Pa. 141, 364 A.2d 1307, the court held the natural mother was equitably estopped from seeking to terminate the parental relationship between her former husband and the child born during the marriage. The court reasoned petitioner had lived with her former husband five months following the birth of the child, and after separation from him, accepted child support from him. Moreover, a separation agreement referred to the former husband as the father of the child, and the final order awarding custody to the petitioner also acknowledged the former husband as the natural father of the child. (Young, 469 Pa. at 150-52, 364 A.2d at 1312-13.) *576 The court recognized the former husband maintained and lovingly carried out the duties of father since the child's birth and was entitled to maintain the relationship. Since the former husband's parental rights were not terminated, the absence of his consent to the adoption of the child operated to preclude the adoption even in the presence of the mother's consent. Young, 469 Pa. at 152-54, 364 A.2d at 1313-14.
In Atkinson v. Atkinson (1987), 160 Mich.App. 601, 408 N.W.2d 516, the Michigan court was faced with a similar situation and adopted the theory of "equitable parent." The Michigan Court of Appeals held that the wife may establish the nonpaternity of the husband through blood tests, but that, notwithstanding the fact that the husband was not the biological father, he may acquire rights of paternity under the "equitable parent" theory. (Atkinson, 160 Mich.App. at 608-09, 408 N.W.2d at 517.) The court reversed the trial court's decision to treat the husband as a third party when deciding custody and visitation, and in doing so, it stated:
"[W]e adopt the doctrine of equitable parent and find that a husband who is not the biological father of a child born or conceived during the marriage may be considered the natural father of that child where (1) the husband and the child mutually acknowledge a relationship as father and child, or the mother of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce, (2) the husband desires to have the rights afforded to a parent, and (3) the husband is willing to take on the responsibility of paying child support." Atkinson, 160 Mich.App. at 608-09, 408 N.W.2d at 519.
See also In re Paternity of D.L.H. (Wis.Ct. App.1987), 142 Wis.2d 606, 419 N.W.2d 283.
As the circuit court explained in making its ruling, the theory of making a man who is not the biological father of a child an "equitable parent" under certain appealing circumstances has never been recognized in Illinois. Cases cited by Randy as indicating otherwise are not in point. In re Marriage of Carey (1989), 188 Ill.App.3d 1040, 136 Ill.Dec. 518, 544 N.E.2d 1293, concerns the ability of a nonparent to receive custody over a natural parent who does not have custody (see Ill.Rev.Stat.1987, ch. 40, pars. 601(b)(2), 602). In In re Ashley K. (1991), 212 Ill.App.3d 849, 156 Ill.Dec. 925, 571 N.E.2d 905, the appellate court held that the circuit court abused its discretion by changing custody of a child from a foster parent to a biological parent. Neither case concerns rights of a presumed father when determination is made that he is not the natural father of a child. To adopt the rule suggested would make inroads upon the stated public policy that the "superior right[s] of * * * natural parent[s] [are] recognized * * * in our statutory law." (In re Custody of Peterson (1986), 112 Ill.2d 48, 52, 96 Ill.Dec. 690, 692, 491 N.E.2d 1150, 1152.) While not adopting the "equitable parent" theory, we do determine that Randy had more statutory rights than he was given.
Section 5(a)(1) of the Parentage Act states that "[a] man is presumed to be the natural father of a child" if (1) "he and the child's natural mother" have been married; and (2) "the child is born * * * during such marriage." (Ill.Rev.Stat.1987, ch. 40, par. 2505(a)(1).) The presumption may be "rebutted * * * by clear and convincing evidence" (Ill.Rev.Stat.1987, ch. 40, par. 2505(b)). Section 1-3(13) of the Act includes in the definition of the term "`[p]arent'" a "father whose paternity is presumed" (Ill.Rev.Stat.1987, ch. 37, par. 801-3(13)). Section 2-13(2) of the Act makes "parents" and guardians or "persons having custody or control" of a minor to be named as respondents to a petition or supplemental petition in regard to a minor filed under the Act. Ill.Rev.Stat.1987, ch. 37, par. 802-13(2).
At the time of the initiation of the juvenile proceedings Randy was a "parent" of A.K. within the meaning of the Act because his parentage was presumed. He was properly made a party respondent to the proceedings. Section 1-5(1) of the Act, which speaks of the rights of parties to proceedings under the Act, states in part:
*577 "Except as provided in this Section and paragraph (2) of Sections 2-22, 3-23, 4-20 or 5-22, the minor who is the subject of the proceeding and his parents, guardian, legal custodian or responsible relative who are parties respondent have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examirte witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel." (Emphasis added.) Ill.Rev. Stat.1987, ch. 37, par. 801-5(1).
The stated exceptions to section 1-5(1) of the Act are very limited and are not involved here. Section 1-5(2) of the Act then provides that "any current or previously appointed foster parent or representative of an agency or association interested in the minor has the right to be heard by the court, but does not thereby become a party to the proceeding." (Emphasis added.) (Ill.Rev.Stat.1987, ch. 37, par. 801-5(2).) No case has been called to our attention defining the meaning of this inference of a right merely to be heard. We conclude that the possessor of such a right cannot complain of the ultimate judgment entered as long as he or she has been heard.
The Act "is not entirely clear in regard to the question of who is entitled to participate in * * * dependency proceeding[s] brought under the Act." (In re Winks (1986), 150 Ill.App.3d 657, 661, 103 Ill.Dec. 888, 891, 502 N.E.2d 35, 38.) The legislative scheme we have described is silent as to the position of a presumed father once the presumption is rebutted. One interpretation would be that he no longer has any rights in regard to the case and cannot continue either as a party or as a person having a right to be heard. The circuit court did not adopt this position until the supplemental petition for appointment of a guardian with power to consent to an adoption was filed. If the formerly presumed father is cut out of participation even at this late stage, despite the fact that he may have been the father figure for a child for many years with both he and the child assuming the existence of a parent-child relationship, he would then be denied the rights which a guardian, legal custodian, responsible relative, previously appointed (but no longer serving) foster parent, or even an agency interested in the welfare of the child might have. This makes little sense.
Clearly, the statutory scheme is ambiguous in regard to the status of one in Randy's position when the presumption of parentage is rebutted. When the meaning of a statute is in doubt, the court must ascertain legislative intent and, in doing so, "consider the entire statute as well as the evil to be remedied and the object and purpose to be attained." (People ex rel. Daley v. Datacom Systems Corp. (1991), 146 Ill.2d 1, 14, 165 Ill.Dec. 655, 661, 585 N.E.2d 51, 57; see also City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268 (1988), 122 Ill.2d 353, 364, 119 Ill.Dec. 360, 364, 522 N.E.2d 1219, 1223.) Application of this rule to the statutory scheme involved here persuades us that one in Randy's position should not be dismissed from the case until it is concluded.
In a proceeding under section 2-29 of the Act (Ill.Rev.Stat.1989, ch. 37, par. 802-29) or its predecessor, the object and purpose to be obtained is a determination as to whether the child's parents have given up their parental rights or have been found to be unfit parents and, if so, whether the best interests of the minor are served by appointment of a guardian with power to consent to adoption of the child. (In re Johnson (1977), 54 Ill.App.3d 627, 631, 12 Ill.Dec. 756, 758, 370 N.E.2d 560, 562.) The evil to be remedied is that which a child suffers when it is not in an adequate permanent home setting with adequate parent figures.
In determining the best interests of the child, a man married to the child's mother at the time of its birth would be likely to have important information to provide to the court as to the best interest of the minor after the rights of the natural *578 parents have been terminated. This would be especially true when this formerly purported father had lived with the mother and the child ostensibly as the child's father for an extended period of time. Strong bonds may have developed between that man and the child which should be considered in regard to the child's future if the formerly purported father is a good person. Another aspect of the need for continued participation by that person is illustrated by the facts of this case. The marriage of Brenda and Randy had broken down. The petitioner was Brenda's grandmother. Although the State's Attorney representing the petitioner and the guardian ad litem or attorney for the child are under a duty to look out for the best interests of the minor, the continued participation of the one who was presumed to be the child's father can give the court a more balanced picture of the situation.
Any formerly presumed father who might qualify under the law of other States as an "equitable parent" would benefit by remaining in a section 2-29 proceeding until all issues are resolved because he would have an opportunity to persuade the court to frame its dispositional order in such a way as to be consistent with any ability he might have to adopt the child. By keeping such a person in the section 2-29 proceeding to the end, he obtains some of the protection which the "equitable parent" rule might give him while, at the same time, the State is relieved of the burden of establishing his unfitness when the child's best interests appear notto include any role for the formerly presumed father. Thus, our determination that once the presumed father is brought into the section 2-29 proceeding he can remain in the proceeding after the presumption of parentage is rebutted serves not only to protect that individual but also to promote the stated legislative purpose of serving the best interests of the child.
When we state that a formerly presumed father is entitled to remain in the case, we mean that he should be treated as a party entitled to notice of hearing and to present evidence, cross-examine witnesses and make argument. He would have a right to appeal, but on appeal he could only complain of a denial of the foregoing rights.
While we hold that the circuit court should not have dismissed Randy from the case, we recognize that the circuit court proceeded carefully, had no precedent to guide it, and kept Randy in the case for quite awhile after his parentage was negated. Upon the record of the case we are assured that Randy suffered no prejudice by being dismissed from the case. The record showed that in 1987, he was convicted of two counts of battery committed against a seven-year-old child. In 1985, he was placed on probation for one year for disorderly conduct. As a juvenile he had been found to be neglected and in need of supervision because of sexual contacts between him and minors. The report of a psychiatric examination indicated he was mildly retarded and in need of therapy to handle his sexual acting out. The report also indicated he displayed emotional immaturity and an inability to exercise proper parenting skills which was due, in part, to his mental limitations. The marriage lasted less than three years. We are satisfied that Randy's further participation in the section 2-29 proceedings would not have changed the result or enabled him to have a closer relationship to A.K.
The dismissal of Randy from the juvenile proceedings did not result in reversible error. Accordingly, we affirm the order which dismissed him from those proceedings.
Affirmed.
STEIGMANN, P.J., concurs
COOK, J., dissents.
Justice COOK, dissenting:
The majority has given careful thought to this case, as did the trial court. I respectfully take a different view based on the language of the Act and the important policy considerations involved. The majority holds that Randy should have been allowed to participate (but was not prejudiced here by nonparticipation). I would go *579 further and require the State to prove Randy unfit, as would be required if he were a biological father.
The importance of the familial relationship, both to the individuals involved and to society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role the relationship plays in promoting a way of life through the instruction of childrenas well as from the fact of blood relationship. (Smith v. Organization of Foster Families for Equality & Reform (1977), 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14, 35.) Disruption of the continuity of relationship between the child and his "psychological parents" is almost certain to adversely affect the child's development. (Rodriguez v. Koschny (1978), 57 Ill.App.3d 355, 362, 14 Ill.Dec. 916, 921, 373 N.E.2d 47, 52.) Assume a situation, along the lines of the majority's hypothetical, where one individual is the biological father of a 15-year-old child, but a second individual believes himself to be, and is believed by the child to be, the biological father. The second individual does everything that parents do for children. The first individual does not even know the child exists. Which of these is the child's "parent"?
The answer is found in the Act.
"`Parent' means the father or mother of a child and includes any adoptive parent. It also includes the father whose paternity is presumed or has been established under the law of this or another jurisdiction." (Ill.Rev.Stat.1987, ch. 37, par. 801-3(13).)
The Act by definition establishes that respondent is a "parent," and he should be treated as one. I see nothing in the Act which allows the State to rebut the presumption of paternity, or attack a judgment establishing paternity, just because one of those options would be easier than establishing unfitness. Because of the likelihood that a presumed parent will have the same bond with the child as would a biological parent, the State should be required to prove unfitness, not nonpaternity, before it terminates parental rights. The majority opinion reads the presumed parent out of the Act's definition. Perhaps all termination of parental rights cases will now begin with a blood test.
The situation presented by this case is a narrow one, one not presented in most cases involving stepfathers or foster fathers. Stepparents apparently have no right to be proved unfit. (In re Adoption of Weller (1977), 47 Ill.App.3d 492, 5 Ill. Dec. 760, 362 N.E.2d 73 (construing the Adoption Act (Ill.Rev.Stat.1975, ch. 4, par. 9.1-1 et seq.)).) Foster parents, no matter how close their relationship with the child, need not be proved unfit. Foster parents have the right to be heard in a proceeding under the Act, but are not parties. Ill.Rev. Stat.1987, ch. 37, par. 801-5; see Johnson v. Burnett (1989), 182 Ill.App.3d 574, 582, 131 Ill.Dec. 517, 522, 538 N.E.2d 892, 897 (there can be no expectation that foster placement will continue to exist).
An apparent father, such as Randy, is more like a biological father, or an adoptive father, than like a stepfather or foster father. In the absence of statute, a stepfather has no obligation to support the child, except perhaps where the stepchild believed the stepfather was his father and the stepfather encouraged that belief. An apparent father, such as Randy, will by the nature of things be required to pay child support until he suspects he is not the father; and even then, he will be required to pay child support if he does not legally contest paternity within two years. (In re Marriage of Beckett (1990), 195 Ill.App.3d 424, 428, 142 Ill.Dec. 25, 28, 552 N.E.2d 375, 378.) A stepparent who seeks to maintain the parent-child relationship can be faulted for not adopting the child, at least where adoption was possible. Randy cannot be faulted for failure to adopt A.K. because he never had reason to suspect that such a procedure was necessary.
The majority opinion suggests that to adopt the "equitable parent" concept "would make inroads upon the stated public policy that the `superior right[s] of * * * natural parent[s] are recognized * * * in our statutory law,'" quoting Peterson. (Maj. op. at 576.) Peterson involved a dispute between a father and maternal grandparents *580 and cannot be read to express a preference for a biological father who had never seen the child, over an individual who thought he was the father and actually raised the child. The majority opinion does not secure rights to biological fathers. It only takes rights away from apparent fathers.
Biological relationships are not the exclusive determination of the existence of a "family" for purposes of the due process clause. (Smith, 431 U.S. at 843, 97 S.Ct. at 2109, 53 L.Ed.2d at 34.) "The scope of these rights extends beyond natural parents. The `parent' in Prince itself, for example, was the child's aunt and legal custodian." (Smith, 431 U.S. at 843 n. 49, 97 S.Ct. at 2109 n. 49, 53 L.Ed.2d at 34 n. 49, citing Prince v. Massachusetts (1944), 321 U.S. 158, 159, 166, 64 S.Ct. 438, 439, 442, 88 L.Ed. 645, 649, 652. ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents").) Where a child has been placed with a man as an infant, has never known his natural father, and has remained continuously for several years in the care of the same man, it is natural that the man should hold the same place in the emotional life of the child, and fulfill the same socializing functions, as a natural father. (See Smith, 431 U.S. at 844, 53 L.Ed.2d at 35 (speaking of foster parents).) This is even more true when both the child and the man believe that the man is the biological father. When it is known that the man is not the biological father, at least the man and the child can attempt to control their relationship.
The State argues that previous cases have limited the term "parent" to mean a biological parent, and excluded the husband of the natural mother. The cases cited, however, were decided under the Adoption Act, and the husbands there at all times knew they were not biological fathers. (In re Adoption of McFadyen (1982), 108 Ill. App.3d 329, 64 Ill.Dec. 43, 438 N.E.2d 1362, Weller, 47 Ill.App.3d 492, 5 Ill.Dec. 760, 362 N.E.2d 73.) The statute has changed significantly since these two cases were decided. The language that the definition of "parent" includes "the father whose paternity is presumed or has been established under the law of this or another jurisdiction" (new material indicated by italics) was not added to the Act until 1985. Pub.Act 83-1372, § 24, eff. July 1, 1985 (1984 Ill.Laws 2627, 2643).
The State argues we should look to the definition of "parent" in the Adoption Act (both McFadyen and Weller were decided under the Adoption Act), not the definition found in the Act. The Adoption Act defines "parent" as "the father or mother of a legitimate or illegitimate child." (Ill.Rev. Stat.1987, ch. 40, par. 1501(E).) The question may be asked why different rules should apply under the Act and the Adoption Act. (See Johnson, 182 Ill.App.3d at 581, 131 Ill.Dec. at 522, 538 N.E.2d at 897 (foster parent entitled to notice under Act but not under Adoption Act).) We need not attempt to answer that question here. The present case is clearly one brought under the Act, the Act appropriately resolves this issue, and the Act's definition of "parent" should be applied. Even were we to apply the Adoption Act definition (that a "parent" is a "father"), the dictionary definition of "father" includes "one related to another in a way suggesting that of father to child." (Webster's New Collegiate Dictionary 418 (1976).) The word "father" is one of broad general meaning, which would include all sorts of individuals; we speak of stepfathers and foster fathers. A presumed father is a "father." (Ill.Rev.Stat. 1987, ch. 37, par. 801-3(13) ("the father whose paternity is presumed").) If the legislature had intended a more narrow definition surely that intent would be found somewhere in the statute.
There has also been a judgment establishing paternity in this case, in the dissolution of marriage action filed by Brenda. Children are generally not barred by issues decided in their parents' dissolution proceedings, because they are not parties or privies to such actions. (Simcox, 131 Ill.2d 491, 137 Ill.Dec. 664, 546 N.E.2d 609.) A.K., however, was a party to the dissolution action here, because A.K. was represented by a guardian ad litem. Courts *581 should be careful when they make children parties to litigation which would not otherwise be binding upon them. It could be argued that a final order had never been entered in the dissolution case at the time the juvenile court considered the question of paternity. The issue has not been raised by the parties, however, and I assume there was a final order here.
The State argues that it was not a party to the dissolution of marriage action and was not bound by any judgment in that action. The Parentage Act gives public agencies a much longer time to bring paternity actions than others are allowed, up to two years after the agency has ceased to provide assistance to the child. (See Ill. Rev.Stat.1987, ch. 40, par. 2508(a)(1).) This case does not involve an agency bringing an action in its own right, for example to collect past-due child support. Assuming that section 8(a)(1) of the Parentage Act would allow the State's Attorney to file a nonpaternity action (as opposed to an action to establish paternity) outside the standard two-year statute of limitations in a case like this, the State's Attorney should be required to respect the best interests of the child in bringing the action. It is generally in the best interests of the child that questions of paternity be resolved as early as possible, and that once resolved the issue not be disturbed in the absence of extremely compelling circumstances. See In re Marriage of O'Brien (1993), at 247 Ill.App.3d 745, 750, 187 Ill.Dec. 416, 419, 617 N.E.2d 873, 876.
Under prior versions of the Paternity Act (see Ill.Rev.Stat.1979, ch. 40, par. 1351 et seq.) it would not have been possible to show that a husband who was supporting a child of the marriage was not in fact the father of that child. (Happel v. Mecklenburger (1981), 101 Ill.App.3d 107, 117, 56 Ill.Dec. 569, 577, 427 N.E.2d 974, 982.) Habeas corpus or declaratory judgment actions might be available, but were disfavored. The Parentage Act for the first time specifically recognized an action to establish nonpaternity, making it subject to the same short statute of limitations which applied to other such actions. (See Ill.Rev. Stat.1987, ch. 40, par. 2508(a)(3).) The legislature may have recognized that making nonpaternity actions easier could cause problems for apparent fathers, such as the problem addressed in this case. The same public act which adopted the Parentage Act also changed the Act to define "parent" to include "the father whose paternity is presumed." (New material indicated by italics.) Pub.Act 83-1372, § 24, eff. July 1, 1985 (1984 Ill.Laws 2627, 2643).
The trial court here required a paternity hearing on its own motion. The trial court was concerned that if someone other than Randy was the biological father that individual could subsequently upset any placement of A.K. The trial court's concern is a real one. The problems caused by searching out biological fathers who have taken no interest in a child, just so their rights may be terminated, has led to major criticism of the Supreme Court's decision in Stanley v. Illinois (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. See 2 H. Clark, The Law of Domestic Relations in the United States § 21.2, at 572-81 (2d ed.1987).
Apart from that concern, there seems to be an assumption in the majority opinion that if a paternity action can be brought, it should be brought. (Maj. op. at 574.) I reject that assumption. In In re Marriage of Ingram (1988), 176 Ill.App.3d 413, 418, 125 Ill.Dec. 918, 921, 531 N.E.2d 97, 100, a mother sought to bring a paternity action on behalf of the child. The court rejected the idea that an action which "[sought] to deprive the child of the only father he has known" could be considered brought on behalf of the child. (Ingram, 176 Ill. App.3d at 418, 531 N.E.2d at 100.) A determination of a child's biological father may not always be in a child's best interests. (In re Custody of D.A. (1990), 201 Ill.App.3d 810, 823, 146 Ill.Dec. 1021, 1028, 558 N.E.2d 1355, 1362.) A trial court has discretion not to appoint a guardian ad litem who could file a paternity action on behalf of the child (Klawitter v. Crawford (1989), 185 Ill.App.3d 778, 788, 133 Ill.Dec. 721, 727-28, 541 N.E.2d 1159, 1165-66), and a guardian ad litem once *582 appointed may choose not to file a paternity action. The court's ruling on paternity here may have been viewed as a means of shortening the termination of parental rights case. However, until Randy was found to be unfit it could not be said that depriving A.K. of the only father he had ever known was in A.K.'s best interests.
It may be argued that even after parental rights have been terminated the decision who should adopt the child will be made on the basis of the child's best interests, which is sufficient protection for someone in Randy's position. A court does have the power to award custody to someone like Randy after parental rights have been terminated, but that possibility is not enough. That possibility would not suffice for a biological father who actually raised a child, and should not be enough for an apparent father who actually raised a child. An apparent father is more important to a child than a biological father whom the child does not know exists. These determinations are "unusually open to the subjective values of the judge." (Santosky v. Kramer (1982), 455 U.S. 745, 762, 102 S.Ct. 1388, 1399, 71 L.Ed.2d 599, 612.) Although the majority states that if an apparent father is allowed to remain in the case "he would have an opportunity to persuade the court to frame its dispositional order in such a way as to be consistent with any ability he might have to adopt the child" (maj. op. at 578), the statute as construed by the majority does not afford an apparent father any priority.
Although critical of the trial court's dismissal of respondent from the case, the majority concludes that respondent suffered no prejudice because of (1) respondent's 1987 conviction of battery against a seven-year-old child, (2) his 1985 probation for disorderly conduct, and (3) his juvenile record. It appears the trial court took judicial notice of those matters. Respondent was certainly never afforded any type of hearing, and we should not attempt to shore up the trial court's ruling on the basis of any such one-sided evidence. It may be that respondent is less than desirable as a parent, or even that he is unfit. The rule which the State argues for, however, that apparent fathers who are not biological fathers may be dismissed from a termination of parental rights case at the earliest opportunity, would apply to good fathers as well as bad.
In dissolution cases a stepparent with close ties to a child has been awarded custody in preference to a biological parent who had not had custody for many years. (See Carey, 188 Ill.App.3d 1040, 136 Ill. Dec. 518, 544 N.E.2d 1293.) As the majority points out, dissolution of marriage cases are different from termination of parental rights cases. In dissolution cases, the court must select a custodian, often being forced to choose between two very capable and loving parents. In termination cases the court deals with a child in trouble, and parents who are so questionable that the court must decide whether to completely terminate the relationship between parent and child. The fact remains that in Carey a stepmother with whom the child had resided was preferred as a custodian over the child's natural mother. If a petition to terminate parental rights had been filed in Carey, under the trial court's ruling here the preferred custodian, the stepmother, could not have been involved in the case. Under the rule of the majority, the stepmother would not have fared much better, being not much more than a bystander.
The State cites In re Estate of Edwards (1982), 106 Ill.App.3d 635, 62 Ill.Dec. 407, 435 N.E.2d 1379, for the proposition that equitable adoption is not recognized in Illinois. Edwards involved foster parents who attempted to sue under the Wrongful Death Act (Ill.Rev.Stat.1979, ch. 70, pars. 1 through 2.2) when the child was struck by a car and killed. The foster parents had not completed the steps for adoption, but fully intended to adopt, and had treated the child as their own. The court rejected their claim on the basis the Wrongful Death Act (not the Act) was to be strictly construed, but noted that in other States when actions were brought by children they had been allowed to sue as an "adopted" child and the adopting parent had been estopped from denying that he assumed the obligation. Edwards noted that on that basis *583 in Illinois a child had been allowed to inherit from a foster parent. (Edwards, 106 Ill.App.3d at 638, 62 Ill.Dec. at 409-10, 435 N.E.2d at 1381-82, citing Dixon National Bank v. Neal (1955), 5 Ill.2d 328, 331, 125 N.E.2d 463, 465.) The rule that a parent must be proved unfit before parental rights are terminated generally works in favor of the best interests of the child. With all their faults and mistakes parents will generally be more successful in caring for their children than strangers or agencies of the State. Edwards is not authority for the proposition that equitable adoption should not be recognized in a case like this one.