NO. 4-10-0614          Filed 12/23/10

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re C.C., So. C., and Sa. C.,<br>Minors,<br>THE PEOPLE OF THE STATE OF ILLINOIS,<br>      Petitioner-Appellee,<br>      v.<br>MARLENE LONG,<br>      Respondent-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from<br>Circuit Court of<br>Champaign County<br>No. 10JA36<br><br>Honorable<br>Richard P. Klaus,<br>Judge Presiding. |

_____

JUSTICE POPE delivered the judgment of the court, with opinion:

At an August 4, 2010, dispositional hearing in a juvenile neglect case involving three children, the trial court found respondent grandmother, Marlene Long, who was a party to this case because of her status as the legal guardian for two of the children, unable for reasons other than financial circumstances alone to care for, protect, train, or discipline the two children.  The court further found the health, safety, and best interests of these two minors would be jeopardized if they remained in her custody.

The trial court removed guardianship over the two children from Long and gave their custody and guardianship to the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).  The court then dismissed Long as a party from the case and discharged her court-appointed counsel.

Long appeals, arguing the trial court erred in dismissing her as a party from the case, which resulted in her being

denied services to become able to exercise guardianship over the two children. Long makes no arguments regarding the court's determination it was in the children's best interest to place them in the guardianship of DCFS. We reverse the trial court's dismissal of Long as a party to this case.

## I. BACKGROUND

In May 2010, the State filed a petition for adjudication of neglect and shelter care on behalf of C.C. (born May 22, 2002), So. C. (born February 22, 2006), and Sa. C. (born April 4, 2009). This appeal involves only C.C. and So. C. The petition named Jacqueline Camfield, mother of C.C. and So. C.; Cyrus Wildman, putative father of C.C. and So. C.; and Marlene Long, guardian of C.C. and So. C.

According to the petition, Long was awarded guardianship of C.C. in an abuse-neglect case in Piatt County (case No. 04-JA-1). Respondent received guardianship of So. C. on May 23, 2007, in Piatt County case No. 07-P-20. Count III of the State's petition alleged that C.C. and So. C. were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2008)) because residing with respondent was injurious to their welfare. This count alleged respondent left the children in the care of an inappropriate caregiver. That inappropriate caregiver was their mother, Jacqueline Camfield. In May 2010, the trial court appointed a special advocate (CASA) as guardian ad litem for the minors.

A shelter-care report prepared on May 5, 2010, by a child protection investigator noted DCFS was called on May 2, 2010. The caller stated Sa. C. (the third child, who is not at issue in this appeal) was at risk for harm. The reporter alleged Camfield and her paramour were involved in a domestic dispute, which started when the paramour tried to stop Camfield from leaving to buy cocaine while Sa. C. was asleep upstairs.

The investigator noted she questioned Camfield about Long's role with the children. Camfield stated Long was C.C. and So. C.'s legal guardian, but Camfield took care of the children on weekends and after school until Long got off work. The investigator spoke with Camfield's father about her concerns for his grandchildren. The investigator informed Camfield's father of the five prior indicated reports, which all involved substance abuse and domestic violence.

Camfield's father stated he had taken Sa. C. after his daughter's arrest. He said he was concerned Long would return C.C. and So. C. to Camfield as soon as she was released from jail. According to the report:

"[Camfield's father] advised he is concerned about [Long's] inability to keep the children safe. He indicated she has a kind heart, but, she continues to allow their daughter, to take care of [C.C.] and [So. C.] while she works despite her knowledge of [Camfield's] substance abuse issues. He

- 3 -

again reiterated that as soon as their daughter got out of jail, [Long] allowed their daughter to take care of [So. C.] and [C.C.]. [Camfield's father] and his wife indicated [Long] had recently contacted them and asked them to care for the children as well. He advised he was very concerned that should some intervention not be taken, [So. C.] and [C.C.] did not stand a chance in life."

The investigator noted in the report protective custody was taken of the children from Long because (1) Camfield had lived with respondent for extended periods of time and had used alcohol and engaged in behavior that put the children at risk, and (2) Long had allowed Camfield to take care of the children even though she knew about Camfield's substance-abuse problems.

Long told the investigator she had been a stable caregiver for C.C. and So. C. since they were infants and had never allowed drugs or alcohol in her home. While Long admitted she knew about Camfield's substance-abuse issues, Camfield drank and abused drugs elsewhere. Long stated she had always been the children's caregiver. Long told the investigator Camfield picked the children up from school and watched them until Long got home from work. Long indicated she was the person who first turned her daughter in to DCFS. Long informed the investigator Camfield was no longer welcome to live in Long's home and she had no room for Camfield after downsizing her home.

The report noted Cyrus Wildman, father of C.C. and So. C., had signed a consent making Long the guardian of C.C. and So. C. He had no contact with the children. However, Wildman's wife told the investigator they had been trying to get in touch with the children, but no one would return their calls.

The investigator recommended C.C. and So. C. be placed in the temporary custody of DCFS. On May 6, 2010, the trial court placed temporary custody of the children with the guardianship administrator for DCFS. The court granted Camfield, Wildman, and Long supervised visitation with the children.

At a July 7, 2010, hearing, Camfield stipulated to count II of the petition for adjudication of neglect; Wildman waived his right to an adjudicatory hearing; and Long stipulated to count III of the petition. Long waived adjudication.

In August 2010, the CASA filed a dispositional-hearing report. The report noted C.C. and So. C. were currently in relative foster placement with their paternal grandfather and his wife. The children had separate weekly supervised visits with Camfield and Long. The report noted C.C. and So. C. were healthy and well-groomed, appropriately developed for their age, and had no apparent physical problems.

The report noted Camfield was unemployed and had entered a 30-day treatment program in Charleston, was attending Narcotics Anonymous, and had a Narcotics Anonymous sponsor. The CASA noted Camfield stated she wanted to parent her children and was willing to make the necessary changes in her life to be able

to do so.  Camfield said her mother made it too easy for her not to parent her children.  According to the report, Camfield had no physical or medical limitations preventing her from parenting.

The report indicated Cyrus Wildman had little interaction with the children.  Wildman had convictions for possesion of Ritalin, possession of cannabis, and possession of paraphernalia.  Wildman had also been incarcerated.  He currently worked as a general laborer and machine operator and lived in Monticello.  Wildman claimed he did not parent the children because of his time in prison, his time working in Pennsylvania, Long's refusal to grant visitation, his inability to afford an attorney to pursue his parental rights, and the fact the children lived in Mississippi with Camfield and Long for two years.

The CASA listed the following concerns in her report:

> "The co-dependent relationship of
> Marlene Long and [Camfield] has promoted,
> condoned and enabled [Camfield's] continued
> substance abuse.  [Camfield] is unemployed,
> has no transportation and has not lived inde-
> pendently from her mother as a full[-]time
> parent to her children since their births.
> She has not demonstrated a willingness to
> parent, to assume guardianship of her chil-
> dren[,] or to make the choice to abstain from
> substance abuse.  Nor, does it seem, has
> Marlene Long promoted her daughter's inde-

pendence.

Cyrus Wildman currently holds a full [-]time job.  He is actively participating in his own intact family.  He admits the error of his past choices.  He has recently moved into different housing to accommodate the possibility of his two children having visits or living with him.  Cyrus admits to owing $30,000 in back child support for [C.C.] and [So. C.].  He is underemployed in an unstable economy but appears motivated to work hard.  He has recently undergone an [e]valuation for [s]ubstance [a]buse at Piatt County Mental Health and submitted a drug screen.  The results are pending as of the date of this report.  Cyrus states he does not use any drugs and only occasionally has a beer.  There remains, however, that [C.C.] and [So. C.] are not well bonded with their father.  They have had limited visitations with their father.  They have never even had an over-night visit with him.

* * *

Although this hearing will address the immediate issue of guardianship, the future permanency goal must be considered in

- 7 -

advance.  With two biological parents able and supposedly willing to parent this impending permanency goal for [C.C.] and [So. C.] must consider a 'return home to a biological parent' as a first choice placement.  If neither biological parent is able or willing to parent, then an alternate or substitute parent must then be considered.

* * *

The impending permanency goal to be considered does not allow 'return home to grandmother.'  If, at the [d]ispositional hearing or at a future permanency hearing, neither parent wishes to assert parental rights to parent or if neither parent has made reasonable effort to meet parenting goals, then a substitute parent, such as grandmother, can be considered.

At the present point, however, it weighs upon both the biological parents of [C.C.] and [So. C.], Jackie Camfield and Cyrus Wildman, *** to demonstrate willingness to parent with conviction and application.  A return to grandmother's guardianship may well become a reality in the lives of these children.  In that case, the cyclical pattern

already established of mother and grandmother codependence will again take place."

The CASA recommended the trial court take guardianship and wardship of the three minor children at issue and place them in the custody of DCFS. The CASA also recommended the trial court remove Long as C.C. and So. C.'s guardian and dismiss her as a party in the case. In addition, the CASA recommended Long's scheduled visitation with the children be discontinued. According to the CASA:

"Such visits are disruptive to the children's lives and the grandmother's continued insertion into the parenting triad is confusing and undermining to establishing primary parenting of the biological parents. Marlene Long should be permitted to have some visitation since she has an important relationship with the children[;] however, this visitation should not be equal to the parents or as frequent. Allowing a monthly visitation would seem appropriate to maintaining the established bonds between grandmother and her grandchildren. These visits should remain supervised."

According to a home and background report prepared by Catholic Charities, Long had attended all of the scheduled weekly visits with the children. The report noted visitation appeared

- 9 -

to be going very well and the children were very excited to see her.  The report noted:

> "When asked about her current DCFS involvement, Ms. Long discussed the recent arrest of Ms. Camfield and expressed her surprise over the discovery of Ms. Camfield's ongoing drug use.  Ms. Long talked about Ms. Camfield living with her until February 2010 and allowing Ms. Camfield to watch [C.C.] and [So. C.] intermittently while Ms. Long was working.  Ms. Long acknowledged a strained relationship between her and Ms. Camfield due to her guardianship of [C.C.] and [So. C.]  She also said that being the primary caregiver for her grandchildren was difficult, and she considered shifting guardianship to Mr. Camfield in the past.  Ms. Long emphasized her focus on whatever is best for her grandchildren, while also stating her wish to provide the caregiver role for [C.C.] and [So. C.] again."

Catholic Charities recommended DCFS be granted custody and guardianship over C.C. and So. C.

In August 2010, the trial court entered a dispositional order, finding it in the children's best interests they be made wards of the court and adjudged neglected.  The court found both

- 10 -

Camfield and Wildman unfit and unable to care for, protect, and train, or discipline the minors.  The court found Long unable to care for, protect, and train or discipline the minors.  The court ruled it was in C.C.'s and So. C.'s best interests that custody and guardianship be removed from the respondent parents and placed with DCFS.  The court dismissed Long as a party to the case and discharged her counsel.

This appeal followed.

## II.  ANALYSIS

Long argues the trial court erred in determining removal of Long's guardianship of C.C. and So. C. automatically terminated her status as a party and her ability to partake of services.  She does not appeal the court's finding it was in the children's best interests to be made wards of the court, the court's finding she was unable to care for the children, or the court's decision to name the guardianship administrator for DCFS as the children's guardian.

Long argues that as legal guardian, legal custodian, and a responsible relative, her right to remain a party in this case is clearly evident.  Long cites In re Anast, 22 Ill. App. 3d 750, 318 N.E.2d 18 (1974), in support of her argument.

In Anast, the biological parents of the children at issue divorced.  Anast, 22 Ill. App. 3d at 752, 318 N.E.2d at 19.  The mother was awarded custody of the couple's two children.  Anast, 22 Ill. App. 3d at 752, 318 N.E.2d at 19.  She then married the appellant, Alan Stone.  Anast, 22 Ill. App. 3d at

752, 318 N.E.2d at 19. Stone and the mother later divorced and Stone was awarded custody of his two stepdaughters, ages 15 and 13. Anast, 22 Ill. App. 3d at 752, 318 N.E.2d at 19-20. Two months later, petitions for adjudication of wardship were filed on behalf of Stone's stepdaughters. Anast, 22 Ill. App. 3d at 752, 318 N.E.2d at 20. The petition did not name Stone as a respondent. Anast, 22 Ill. App. 3d at 752, 318 N.E.2d at 20.

DCFS was given temporary custody of the two girls. Anast, 22 Ill. App. 3d at 752, 318 N.E.2d at 20. Stone later appeared and signed a waiver of service and defects in process. Anast, 22 Ill. App. 3d at 752, 318 N.E.2d at 20. The State argued because Stone was not a natural parent, he was not entitled to an adjudicatory hearing to determine his fitness before depriving him of custody, and the trial court agreed. Anast, 22 Ill. App. 3d at 753, 318 N.E.2d at 20.

Although Stone was not a blood relative of the girls, he had legal custody of them pursuant to the divorce action. As a result, the appellate court found:

> "He was entitled to an adjudicatory hearing
> on the issue of his fitness before being
> deprived of custody by the court's
> adjudication of wardship. To hold otherwise
> would ignore the intent of the statute and
> the constitutional rights of Stone to due
> process and the equal protection of the
> laws." Anast, 22 Ill. App. 3d at 754, 318

- 12 -

N.E.2d at 21.
The statute under which the case was tried did not state any one individual was required to be made a party respondent.  Anast, 22 Ill. App. 3d at 754, 318 N.E.2d at 21.  However, the court found the statute

> "obviously contemplates that if a minor is under legal guardianship at the time a petition is filed under the Act, the guardian should be named.  The reasons why are apparent in this case, where an adjudication of neglect against the natural parents was virtually an empty act.  They had already surrendered legal custody in earlier proceedings, and their inaction manifested their disinterest in the outcome of this one.  But natural parents are not the only persons who may have a substantial interest in the welfare of minors.  Numerous references appear in the Act listing in the conjunctive or disjunctive a whole constellation of potentially interested persons:  the parents, guardian, legal custodian and/or a responsible relative.  The category relevant to a particular case is presumed to be participating in proceedings under the Act."  Anast, 22 Ill. App. 3d at 754, 318 N.E.2d at 21.

The court found Stone was entitled to an adjudicatory hearing as a matter of due process by virtue of his interest in the two girls. The court stated refusing him that procedure and imposing upon him the burden of affirmatively winning custody of the girls in a later proceeding was a denial of the equal protection of the law. Anast, 22 Ill. App. 3d at 756, 318 N.E.2d at 22. According to the court:

> "Where the circustances of a case indicate that a person other than a parent has a substantial interest in a minor in proceedings in the juvenile court, then under the contemplation of the Act that person is a necessary party to the proceedings. Stone was such a person; as legal custodian and stepparent of the two Anast girls he was entitled to the procedural protections incident to an adjudicatory hearing [citation] on the issue of his fitness to retain custody." Anast, 22 Ill. App. 3d at 756, 318 N.E.2d at 22.

Unlike in Anast, in this case, Long was named as a respondent and did receive an adjudicatory hearing. She stipulated to leaving the children with an inappropriate caregiver at the July 2010 adjudicatory hearing.

The issue in this case is whether the trial court erred in dismissing Long as a party after a dispositional hearing in

which it found her unable to act as a custodian for the children and placed the children under the guardianship of the guardian-ship administrator of DCFS. According to Long, section 2-28 of the Juvenile Court Act (705 ILCS 405/2-28 (West 2008)) "clearly envisions that a guardian may be returned to that status."

However, the State cites the Third District's opinion in In re S.B., 373 Ill. App. 3d 224, 866 N.E.2d 1286 (2007), as support for its argument the trial court properly dismissed Long from the case. In S.B., C.L. was the guardian of S.B, who was born on January 20, 2000. S.B.'s mother was deceased, and his father was serving a 20-year prison sentence. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287. The opinion noted the record did not reveal when or how C.L. became S.B.'s guardian. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287.

The State filed a juvenile petition alleging S.B. was neglected because he was exposed to an injurious environment while in C.L.'s care. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287. According to the petition, C.L. had left S.B. unat-tended on November 19 and 20, 2004, and C.L.'s whereabouts were unknown between November 17 and November 22, 2004. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287. C.L. was named as a respondent as she was the child's guardian. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287.

After the trial court found S.B. to be neglected, S.B. was taken into shelter care. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287. The court later issued a dispositional order,

finding C.L. unfit to care for S.B., making S.B. a ward of the court, and naming DCFS as S.B.'s guardian. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287.

In the dispositional order, the trial court found C.L. had gotten drunk and used crack cocaine while she left S.B. unattended. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287. The order also noted C.L.'s failure to visit S.B. since he was taken into shelter care. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287. Instead of dismissing C.L. from the case at that time as the State requested, the court ordered C.L. to undertake certain tasks, including undergoing a drug and alcohol assessment, completing any recommended treatment as a result of the assessment, and submitting herself to random urine tests and a psychological examination. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287.

In its first permanency review order, the trial court found the previous permanency goal of returning S.B. to C.L.'s home within one year had not been met and that C.L. had not made reasonable efforts toward achieving the permanency goal. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287. The court established a new permanency goal of returning S.B. to C.L.'s home pending a status hearing and again denied the State's request to dismiss C.L. from the case. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287.

In its second permanency review order, the trial court found the prior permanency goal had not been achieved, and C.L.

had not made reasonable efforts toward achieving the permanency goal. S.B., 373 Ill. App. 3d at 226, 866 N.E.2d at 1287. The court changed the permanency goal to substitute care and granted the State's request to dismiss C.L. from the case because of her failure to make reasonable efforts toward the permanency goals established by the court. S.B., 373 Ill. App. 3d at 226, 866 N.E.2d at 1287-88.

C.L. appealed, arguing the trial court erred in dismissing her from the case. S.B., 373 Ill. App. 3d at 226, 866 N.E.2d at 1288. Relying on this court's decision in In re A.K., 250 Ill. App. 3d 981, 620 N.E.2d 572 (1993), and its application of section 1-5(2)(a) of the Juvenile Court Act (705 ILCS 405/1-5(2)(a) (West 2004)), the Third District affirmed the dismissal. S.B., 373 Ill. App. 3d at 227-28, 866 N.E.2d at 1289. According to the Third District's opinion:

"At the time of the dismissal, C.L. was no longer S.B.'s guardian, but she was a previously appointed relative caregiver. Thus, under section 1-5(2)(a), C.L. had the right to be heard by the court concerning the juvenile matter. See 705 ILCS 405/1-5(2)(a) (West 2004); A.K., 250 Ill. App. 3d 981, 620 N.E.2d 572. However, she did not have the right to be a party to the proceedings. See 705 ILCS 405/1-5(2)(a) (West 2004); A.K., 250 Ill. App. 3d 981, 620 N.E.2d 572. Therefore,

- 17 -

we hold that the trial court did not err as a matter of law by dismissing C.L. from the case in the second permanency review order after the dispositional order. See 705 ILCS 405/1-5(2)(a) (West 2004); A.K., 250 Ill. App. 3d 981, 620 N.E.2d 572." S.B., 373 Ill. App. 3d at 227, 866 N.E.2d at 1289.

The Third District relied in part on the following language from section 1-5(2)(a) of the Juvenile Court Act (705 ILCS 405/1-5(2)(a) (West 2004)):

" 'Though not appointed guardian or legal custodian or otherwise made a party to the proceeding, any current or previously appointed foster parent or relative caregiver, or representative of an agency or association interested in the minor has the right to be heard by the court, but does not thereby become a party to the proceeding.' " S.B., 373 Ill. App. 3d at 227, 866 N.E.2d at 1288, quoting 705 ILCS 405/1-5(2)(a) (West 2004).

However, this language, which has not changed since the Third District decided S.B., does not support a trial court's decision to dismiss a guardian who is already a party to the proceedings. Section 1-5(2)(a) is only meant to give certain individuals who are not already parties to the proceeding a right to be heard by the court.

The Third District misinterpreted this court's decision in A.K. on which it also relied. The State did the same in its brief to this court. Both the Third District and the State focus on the fact this court affirmed a trial court's dismissal of a named party. However, while this court did affirm the dismissal, this court's decision to affirm was based on the lack of prejudice due to the specific facts relating to the dismissed party in that case.

Both the Third District and the State overlooked important language from this court's decision stating the proper process would have been to allow the named party to remain as a party in the case. In A.K., Brenda and Randy Kirchner were in the midst of dissolution proceedings when Brenda's grandmother filed a petition under the Act alleging that A.K., who was born to Brenda during the marriage, was an abused child because "Brenda had struck and choked the child and Randy was 'not an appropriate custodian.'" A.K., 250 Ill. App. 3d at 983, 620 N.E.2d at 574. Both Brenda and Randy were joined as respondent parents. A.K., 250 Ill. App. 3d at 983, 620 N.E.2d at 574.

During the proceedings, the trial court entered an order finding Randy was not the biological father of A.K. A.K., 250 Ill. App. 3d at 983, 620 N.E.2d at 574. The court later dismissed Randy from the case. A.K., 250 Ill. App. 3d at 983, 620 N.E.2d at 574.

In reviewing the trial court's actions, this court stated "the proper practice would have been to permit Randy to

remain in the juvenile proceeding with opportunity to be heard until an order final as to all parties was entered." A.K., 250 Ill. App. 3d at 984, 620 N.E.2d at 575. This court noted the legislative scheme behind the Juvenile Court Act is silent "as to the position of a presumed father once the presumption is rebutted." A.K., 250 Ill. App. 3d at 987, 620 N.E.2d at 577. The court found the statutory scheme ambiguous with regard to someone in Randy's position. Because this court found the statutory scheme ambiguous, it looked at the legislature's intent and found the legislature meant for someone in Randy's position to be able to participate until the case is concluded. A.K., 250 Ill. App. 3d at 988, 620 N.E.2d at 577.

This court stated the object of a proceeding pursuant to section 2-29 of the Juvenile Court Act (Ill. Rev. Stat. 1989, ch. 37, par. 802-29) as it read at that time was to determine whether a child's parents have surrendered their parental rights or been found to be unfit parents, and, if so, whether it is in the child's best interest to appoint a guardian with the power to consent to the adoption of the child. A.K., 250 Ill. App. 3d at 988, 620 N.E.2d at 577.

This court noted a man who was married to the child's mother at the time of the child's birth would likely have important information he could provide to the court regarding the child's best interests after the termination of the natural parent's rights. A.K., 250 Ill. App. 3d at 988, 620 N.E.2d at 577-78. This would especially be the case when the presumed

father and the child had lived together for an extended period of time and the man had acted as the child's father.  A.K., 250 Ill. App. 3d at 988, 620 N.E.2d at 578.  According to this court:

> "Strong bonds may have developed between that man and the child which should be considered in regard to the child's future if the formerly purported father is a good person.  *** Although the State's Attorney representing the petitioner and the guardian ad litem or attorney for the child are under a duty to look out for the best interests of the minor, the continued participation of the one who was presumed to be the child's father can give the court a more balanced picture of the situation.

> Any formerly presumed father who might qualify under the law of other States as an 'equitable parent' would benefit by remaining in a section 2-29 proceeding until all issues are resolved because he would have an opportunity to persuade the court to frame its dispositional order in such a way as to be consistent with any ability he might have to adopt the child.  By keeping such a person in the section 2-29 proceeding to the end, he obtains some of the protections which the

'equitable parent' rule might give him while, at the same time, the State is relieved of the burden of establishing his unfitness when the child's best interests appear not to include any role for the formerly presumed father.  Thus, our determination that once the presumed father is brought into the section 2-29 proceeding he can remain in the proceeding after the presumption of parentage is rebutted serves not only to protect that individual but also to promote the stated legislative purpose of serving the best interests of the child.

When we state that a formerly presumed father is entitled to remain in the case, we mean that he should be treated as a party entitled to notice of hearing and to present evidence, cross-examine witnesses and make argument.  He would have a right to appeal, but on appeal he could only complain of a denial of the foregoing rights."  A.K., 250 Ill. App. 3d at 988-89, 620 N.E.2d at 578.

While this court affirmed the dismissal, it did so because it found Randy suffered no prejudice by being dismissed based on the record in that case.  The record showed Randy was convicted in 1987 of two counts of battery against a seven-year-

old child.  A.K., 250 Ill. App. 3d at 989, 620 N.E.2d at 578.  He had previously been placed on probation for disorderly conduct. In addition, he had been found neglected when he was a juvenile and in need of supervision because of instances of sexual contact between him and minors.  A psychiatric examination report indicated he was mildly retarded, displayed emotional immaturity and an inability to exercise proper parenting skills due in part to his mental limitations, and needed therapy to control his sexual acting out.  A.K., 250 Ill. App. 3d at 989, 620 N.E.2d at 578. The court also noted the marriage lasted only three years.  As a result, the court determined Randy's further participation would not have changed the result in the case or enabled him to have a closer relationship with A.K.  A.K., 250 Ill. App. 3d at 989-90, 620 N.E.2d at 578.  However, we specifically held Randy should not have been dismissed from the case.  A.K., 250 Ill. App. 3d at 989, 620 N.E.2d at 578.  Unlike in A.K., we cannot say Long and, more importantly, the children will not be prejudiced by Long's dismissal.

Just as the Juvenile Court Act is silent as to the position of a presumed father once the presumption is rebutted, the Act does not specifically address the status of a guardian who is a necessary party to the proceeding where the trial court appoints DCFS as guardian.  However, we find the legislature intended for a minor's legal guardian to remain a party throughout the proceedings, regardless of whether the trial court names DCFS as guardian.

Section 1-5(1) of the Juvenile Court Act states:

"[T]he minor who is the subject of the proceeding and his parents, <u>guardian</u>, legal custodian or responsible relative who are parties respondent have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel. *** <u>Counsel</u> <u>appointed</u> <u>for</u> <u>the</u> <u>minor</u> <u>and</u> <u>any</u> <u>indigent</u> <u>party</u> <u>shall</u> <u>appear</u> <u>at</u> <u>all</u> <u>stages</u> <u>of</u> <u>the</u> <u>trial</u> <u>court</u> <u>proceeding</u>, <u>and</u> <u>such</u> <u>appointment</u> <u>shall</u> <u>continue</u> <u>through</u> <u>the</u> <u>permanency</u> <u>hearings</u> <u>and</u> <u>termination</u> <u>of</u> <u>parental</u> <u>rights</u> <u>proceedings</u> <u>subject</u> <u>to</u> <u>withdrawal</u> <u>or</u> <u>substitution</u> <u>pursuant</u> <u>to</u> <u>Su-</u> <u>preme</u> <u>Court</u> <u>Rules</u> <u>or</u> <u>the</u> <u>Code</u> <u>of</u> <u>Civil</u> <u>Procedure</u>." (Emphases added.) 705 ILCS 405/1-5(1) (West 2008).

This section gives a guardian not only party status but also legal representation throughout all of the proceedings. The General Assembly could not have intended a guardian, legal custodian, or responsible relative, who the Juvenile Court Act requires the State to name as a respondent, could simply be

- 24 -

dismissed as a party if guardianship of the child was awarded to DCFS at a dispositional hearing.

It is in the children's best interest Long be allowed to remain as a party in this case for many of the same reasons this court thought a presumed father should be allowed to remain a party even after the presumption of paternity is rebutted. If the trial court decides to terminate the parental rights of the minors' parents, Long will likely be able to provide the court with important information regarding the children's best interests. She may also decide to seek the restoration of her guardianship.

According to the record in this case, Long had been the primary caregiver for these children most of their lives and strong bonds existed between Long and the children. While she stipulated to count III of the State's petition, which alleged she left the children in the care of an inappropriate caregiver, i.e., their biological mother, the report prepared by Catholic Charities noted Long expressed surprise over the discovery of Camfield's ongoing drug use.

Long's behavior was much more benign than the guardian C.L.'s behavior in S.B. In that case, C.L. had gotten drunk and used crack cocaine while the minor was left unattended. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287. However, even in that case, the trial court did not immediately dismiss C.L. after entering the dispositional order naming DCFS as the minor's new guardian. S.B., 373 Ill. App. 3d at 224, 866 N.E.2d at 1286.

Instead, the first permanency goal implemented was returning the minor to C.L.'s home within one year. S.B., 373 Ill. App. 3d at 225, 866 N.E.2d at 1287. Only in its second permanency review order did the trial court grant the State's motion to dismiss C.L. as a party because of her failure to make reasonable efforts toward the permanency goals. S.B., 373 Ill. App. 3d at 226, 866 N.E.2d at 1287-88.

In this case, the record does not show any court order placing restrictions on Long allowing the biological mother to watch the children. In addition, this does not appear to be a case in which she placed the children in Camfield's care so she could go out and socialize. According to the Catholic Charities report, Long let Camfield watch the children intermittently while Long was working.

The report noted Long had attended all visits with the children that had been offered. The report stated the visits appeared to go well. According to the report, "Ms. Long comes to the car and greets the children outside before even entering the home. The children appear very excited to see her. They give Ms. Long hugs and kisses."

It is in the children's best interests Long should be allowed to remain a party in this case. She is entitled to notice of hearings and to present evidence, cross-examine witnesses, and present arguments. Further, she is entitled to keep her court-appointed counsel, if she cannot afford to hire her own, and any other services to which she is entitled under the

Juvenile Court Act.

### III. CONCLUSION

For the reasons stated, we reverse the trial court's decision to dismiss Long as a party to these proceedings.

Reversed.

TURNER and MYERSCOUGH, JJ., concur.